Roberto J. Kampfner
California State Bar No. 179026
WHITE & CASE LLP
555 South Flower Street, Suite 2700
Los Angeles, CA 90071
Telephone: (213) 620-7700
Facsimile:  (213) 452-2329
rkampfner@whitecase.com

Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
Bryan A. Lindsey, Esq.
Nevada Bar No. 10662
Schwartz Flansburg PLLC
6623 Las Vegas Blvd. South, Suite 300
Las Vegas, Nevada 89119
Telephone: (702) 385-5544
Facsimile: (702) 385-2741

*Attorneys for the Alleged Debtor*

E-Filed: March 7, 2016

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| IN RE<br><br>JOHN A. RITTER<br><br>Alleged Debtor. | BK-16-10933-ABL<br><br>CHAPTER 7 (Involuntary)<br><br>**MOTION FOR ORDER (A) DIRECTING PARTIES TO MEDIATION AND APPOINTING MEDIATOR; AND (B) STAYING THE INVOLUNTARY BANKRUPTCY CASE OR OTHERWISE EXTENDING TIME TO RESPOND TO INVOLUNTARY PETITION**<br><br>Hearing Date: OST Requested<br>Hearing Time: OST Requested |

John A. Ritter (the "**Alleged Debtor**," or, "**Mr. Ritter**") hereby files his motion for an order (a) directing the parties to mediation and appointing the Honorable Gregg W. Zive, or such other sitting bankruptcy judge who may be available, as mediator; and (b) extending the time for Mr. Ritter to respond to the involuntary petition commencing such case (the "**Motion**"). In support of the Motion, Mr. Ritter states as follows:

## PRELIMINARY STATEMENT

This involuntary bankruptcy proceeding against Mr. Ritter has been improperly commenced. Not only are the creditors that signed and filed the petition against him a small portion of Mr. Ritter's creditors, but they do not satisfy the statutory requirements set forth in 11 U.S.C. § 303(b). Accordingly, the case is subject to dismissal.

Notwithstanding the deficiency in the filing, Mr. Ritter recognizes the value of a collective process in resolving the numerous claims against him. As such, rather than litigate the propriety of the involuntary filing at this time, Mr. Ritter requests that the Court direct Mr. Ritter and the petitioning creditors to engage in a mediation process open to all of Mr. Ritter's creditors. If successful, such a process would, in addition to avoiding litigation regarding the petition, create a structure for preserving and maximizing value for the benefit of all parties in interest.

This case was commenced under chapter 7 of the Bankruptcy Code. Given that much of the value in Mr. Ritter's putative estate is tied up in operating businesses that Mr. Ritter actively runs, a chapter 7 liquidation is likely to minimize—rather than maximize—value. Indeed, degradation of value would begin immediately upon appointment of a trustee. Through the mediation process, assuming good faith participation and rational decision-making by the petitioning creditors and other parties in interest, a better structure for resolving all claims against Mr. Ritter is likely. This could include, among other things, a consensual chapter 11 plan of reorganization.

Absent a consensual process, the issues in a bankruptcy proceeding concerning Mr. Ritter (assuming entry of an order for relief) would result in protracted litigation. The only certainty in this litigation is that it would be costly, time consuming, and reduce the value of Mr. Ritter's estate. A

successful mediation could avert this litigation, maximize value, and result in distributions to creditors far sooner than in a non-consensual scenario.

For these reasons, and as more fully set forth below, Mr. Ritter requests that the Court direct the parties to mediation and stay these proceedings or otherwise extend the time for Mr. Ritter to respond to the involuntary petition filed against him.

## BACKGROUND INFORMATION

### A. The Alleged Debtor

Mr. Ritter, through various entities under the umbrella of Focus Property Group[1] ("**Focus**"), has been engaged in the business of land development for a substantial portion of his professional life.[2] The vast majority of Focus's projects have been in and around Las Vegas—the city Mr. Ritter has called home for over twenty-five years.

Mr. Ritter and Focus's area of emphasis has long been the creation of master planned communities. The process of creating a master planned community begins with raw land and a community concept. The concept is then translated into a design and submitted for approval by the applicable planning body. Once all necessary approvals are obtained, construction can begin. First, utilities services are run and roads and other community features are built. With the basic community infrastructure in place, parcels may be subdivided and sold off to homebuilders to further develop the residential portions and commercial developers to complete the commercial sections of the project. Focus is responsible for planning and developing several of the largest and most successful residential master planned communities in southern Nevada, including the Mountain's Edge and Providence master planned communities. Each of these communities was among the top ten fastest selling master plans in the country from their inception in the early 2000's and continuing through the Great Recession, with Mountain's Edge holding the number one spot in 2007 and 2008.

Over the years since its founding, Focus (and, in turn, its principals) did very well in the real estate markets in which it was active. By the end of 2005, the appraised value of Focus's various

---

[1] Focus Property Group is a name which is used to generally describe a family of investment and operational entities.
[2] Mr. Ritter is the majority owner of Focus.

MOTION FOR ORDER (A) DIRECTING MEDIATION; AND
(B) STAYING, IN PART, INVOLUNTARY BANKRUPTCY
PROCEEDING

real estate holdings $2 billion. Essentially all of Focus's holdings were financed to a certain extent, but at a level which Focus felt was fairly conservative. Private and conventional loans encumbering Focus properties totaled over $700 million. In addition, Focus participated in two major joint ventures—generally known as Inspirada and Kyle Canyon—in partnership with a number of national, publicly traded homebuilders such as KB Homes and Toll Brothers. The allocated portion of the debt on those two projects was also several hundred million. Boiled down, Focus's aggregate financing was a little less than 50% on a loan to value basis. This seemed to everyone—including Focus, the regional and national banks and the credit reporting services—to be a conservative approach to financing that should have comfortably weathered any then-foreseeable turbulence in the real estate and credit markets, and the economy as a whole.

Consistent with prevailing practices in real estate lending and given how Focus developed over the years, the one common element of all Focus's financing was that Mr. Ritter was required to sign personal guarantees on essentially all of the debt. In addition to direct personal guarantees on loans, Mr. Ritter was required to sign personal guarantees on the huge bonding programs for the various development projects, as well as more limited personal and completion guarantees in respect of Inspirada and Kyle Canyon. In short, Mr. Ritter and his entities owned only a little over half of the assets but personally guaranteed essentially every penny of financing, bonding and completion guarantees needed for the full operation of Focus, without any compensation or other preferences tied to those obligations.

Starting in 2008, the economy in general, and the Focus family of entities in particular, came under significant financial pressure. The combination of a severely tightening real estate market and an almost complete freeze of the credit markets caused the Focus entities to be unable to sell property, refinance debt as it matured, or continue making payments on their various loan obligations as they became due. As a result, in February of 2008, Focus missed interest payments on approximately $500 million of multi-beneficiary loans. By the end of 2008 Focus was in a similar position with respect to most of its conventional debt as well.

Initially, these problems posed a clear and immediate problem for Focus, but not directly to Mr. Ritter. Within a few years, however, the ongoing economic and real estate turmoil and Focus's troubles began to impact Mr. Ritter, personally. Over time, Mr. Ritter went from having no foreseeable exposure under his guarantees of Focus debt to hundreds of millions of dollars of potential liability. This staggering spike in Mr. Ritter's liabilities was accompanied by an equally-dramatic drop in the value of Mr. Ritter's primary asset—his interest in Focus.

A significant portion of Focus loan debt was in the form of multi-beneficiary loans, which involved, in some cases, large groups of unrelated lenders and created further complexity. Determined to maximize the value available for distribution to creditors, Focus executed a loan by loan consensual bankruptcy strategy which avoided the dispersion of valuable aggregated land parcels and the liquidation of those assets at the bottom of the market, while providing a mechanism for the multi-beneficiary lenders to hold and manage the property with Focus' and Mr. Ritter's assistance. Through a total of over 40 prepackaged chapter 11 plans confirmed by this Court's Honorable Mike K. Nakagawa, lenders to the Focus entities received equity on account of their claims, and Focus, for a small portion of the new equity and certain other consideration, agreed to continue managing the properties until consummation of a value preserving non-distressed sale. One feature of these plans having particular significance to Mr. Ritter was that they provided for the consensual release of guarantee claims against him by those lenders who voted to accept.

Not all Focus entities underwent bankruptcy proceedings and not all creditors in the bankruptcy proceedings gave Mr. Ritter a release. From 2008 to the present, Mr. Ritter has worked to reduce liability that was not resolved through the Focus pre-packaged bankruptcies. His approach has always been to seek a consensual resolution, although he has defended himself vigorously as necessary. Through settlements, litigation, and the passage of time, Mr. Ritter has reduced his guarantee and other liability relating to Focus considerably.

In sum, the housing crisis caused by the Great Recession devastated Focus, and after a number of years, had a similar impact on Mr. Ritter's business and his personal financial condition. Despite the staggering debt the crisis imposed on him and the crippling effect it had on his business,

Mr. Ritter remained determined to generate value for its creditors. While this has been successful in the vast majority of cases, it has not yet been with respect to the relatively small handful of creditors remaining. Mr. Ritter fully intends to continue his efforts to resolve these claims going forward, whether through this proceeding or otherwise.

### B. Commencement of the Involuntary Bankruptcy Case

On February 29, 2016 (the "**Petition Date**"), Multibank 2009-1 RES-ADC Venture, LLC ("**Multibank**"), Pacific Western Bank ("**PWB**"), and SV Litigation SPE, LLC ("**SV Litigation**," and, together with Multibank and PWB, the "**Petitioning Creditors**") commenced the above-captioned bankruptcy case (the "**Bankruptcy Case**") with the filing of their *Involuntary Petition Against an Individual* [D.I. 1] (the "**Involuntary Petition**") pursuant to section 303 of title 11 of the United States Code (the "**Bankruptcy Code**"). By the Involuntary Petition the Petitioning Creditors seek relief under chapter 7 of the Bankruptcy Code.

Service of the Involuntary Petition and related summons on Mr. Ritter was effected by agreement of undersigned counsel on March 2, 2016 pursuant to Rule 5(b)(2)(E) of the Federal Rules of Civil Procedure, made applicable in these proceedings pursuant to Rules 1018 and 7005 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

In the Involuntary Petition, the Petitioning Creditors allege that Mr. Ritter is generally not paying his debts as they come due. Involuntary Petition, 3. The Petitioning Creditors further allege that they hold (or at least recently held) claims in the aggregate amount of $25,623,806.39 plus applicable fees, costs, and interest. *Id.* at Ex. 1. This amount is comprised of (a) a judgment against Mr. Ritter held by PWB in the amount of $3,369,448.67; (b) a judgment against Mr. Ritter held by SV Litigation in the amount of $2,762,089.96; and (c), in the case of Multibank, a "Commercial Guaranty & Forbearance Letter Agreement" purportedly evidencing a claim which, as of December 15, 2015, allegedly stood at $19,492,267.67. *Id.*

Importantly, Multibank does not have a judgment against Mr. Ritter. As recited in the Forbearance Letter Agreement referenced in the Involuntary Petition (the "**Multibank Forbearance Letter Agreement**"), which was prepared and signed by Multibank, the basis for Multibank's claim

against Mr. Ritter is his guaranty of the obligations of a Focus entity in respect of a commercial loan secured by real property. Specifically, the Multibank Forbearance Letter Agreement provides that:

> The Loan is evidenced and secured by, among other documents and instruments, (i) a Promissory Note dated November 22, 2006, in the original principal amount of $10,111,000 . . . , by [PV Land Investments, LLC (the "**Original Borrower**")], as maker, payable to the order of Lender [(the "**Multibank Note**")]; (ii) a Deed of Trust dated as of November 22, 2006, and recorded as Instrument 673104, Official Records of Nye County, Nevada, and a Water Rights Deed of Trust dated as of November 22, 2006, and recorded as Instrument 676755, Official Records of Nye County, Nevada [(collectively, the "**Multibank Deed of Trust**")], and encumbering certain property described therein [(the "**Multibank Collateral**")]; (iii) a Business Loan Agreement dated as of November 22, 2006, by and between Lender and Original Borrower [(the "**Multibank Loan Agreement**")], (iv) Commercial Guaranties dated as of November 22, 2006 [(collectively, the "**Multibank Guaranties**")], by Focus Contribution, LLC . . ., Holdings Manager, Inc. . . ., John A. Ritter, trustee of Mustang Trust, and John A. Ritter [(collectively, the "**Multibank Guarantors**")] in favor of [Multibank]; and (v) certain other Related Documents as defined in the [Multibank] Loan Agreement [(collectively, the "**Multibank Loan Documents**")].

Multibank Forbearance Letter Agreement, 1.

Under Nevada law, the claim against a guarantor of debt secured by real property is limited to the difference between the amount guaranteed and the value of the collateral securing the primary obligation. This is true whether or not a foreclosure has occurred. Here, Multibank has not foreclosed upon the Multibank Collateral. Accordingly, NRS § 40.495(4) applies and provides, in relevant part:

> If, before a foreclosure sale of real property, the obligee commences an action against a guarantor . . . to enforce an obligation to pay . . . all or part of an . . . obligation secured by a mortgage or lien upon the real property:
>
> (a) The court must hold a hearing and take evidence . . . concerning the fair market value of the property as of the date of the commencement of the action. . . .
>
> (b) After the hearing, if the court awards a money judgment against the guarantor . . . who is personally liable for the debt, the court must not render judgment for more than:
>
>  (1) The amount by which the amount of the indebtedness exceeds the fair market value of the property as of the date of the commencement of the action; or
>
>  (2) If a foreclosure sale is concluded before a judgment is entered, the amount that is the difference between the amount for which the property was actually sold and the amount of the indebtedness which was secured,

whichever is the lesser amount.

Thus, even without regard to any other available defenses, each of which is hereby preserved (including a statute of limitations defense that will be discussed in greater detail below), the amount of any judgment that Multibank *could potentially* obtain against Mr. Ritter in respect of the Multibank Guaranties depends upon the value of the Multibank Collateral. This value has not been determined and, as a consequence, Multibank's claim amount has not been determined and is subject to reasonable dispute. Indeed, Multibank's asserted claim amount in the Involuntary Petition appears to provide no credit whatsoever for the value of the Multibank Collateral in direct contravention of NRS § 40.495(4).

On this basis, and as further set forth herein, Mr. Ritter disputes that the Bankruptcy Case was properly commenced and reserves all rights in respect thereof, including those rights pursuant to 11 U.S.C. § 303(i)(1) and (i)(2).[3]

Nonetheless, Mr. Ritter is prepared to engage with the Petitioning Creditors and such other creditors as may wish to participate in a process designed to achieve a consensual, value-maximizing resolution for all parties in interest.

### RELIEF REQUESTED

By this Motion, Mr. Ritter requests that the Court enter an order substantially in the form of **Exhibit A** attached hereto. Specifically, he requests that the Court direct Mr. Ritter and the Petitioning Creditors to engage in a mediation process, initially lasting sixty (60) days and open to all alleged creditors of Mr. Ritter, for the purposes of negotiating a consensual resolution of the Bankruptcy Case. Mr. Ritter requests that the Honorable Gregg W. Zive, or such other sitting bankruptcy judge who may be available, be appointed mediator. Mr. Ritter further requests that the Court extend the deadline for Mr. Ritter to respond to the Involuntary Petition until some reasonable period following the conclusion of the mediation.

---

[3] Importantly, the two Petitioning Creditors with liquidated claims—SV Litigation and PWB—hold only a very small portion of the debtor against Mr. Ritter.

MOTION FOR ORDER (A) DIRECTING MEDIATION; AND
(B) STAYING, IN PART, INVOLUNTARY BANKRUPTCY
PROCEEDING

Americas 91123856 v1                    8

## JURISDICTION

This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and Rule 1001(b)(1) of the Local Rules of Bankruptcy Practice of the United States District Court for the District of Nevada (the "**Local Rules**") (incorporated as Part III of the Local Rules of Practice for the United States District Court for the District of Nevada). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BASIS FOR RELIEF REQUESTED

Local Rule 9019(a) provides that the Court, on its own initiative or at the request of any party in interest, may "at any time order that a contested matter or adversary proceeding be set for settlement conference or other alternative method of dispute resolution." LR 9019(a)(1). Although certain adversary rules apply, *see* Fed. R. Bankr. P. 1018, a proceeding relating to a contested involuntary petition is treated as a contested matter. *In re Tobacco Rd. Assocs., LP*, 2007 U.S. Dist. LEXIS 22990, *22 (E.D. Pa. Mar. 30, 2007) (citing 6 Norton Bankr. L. & Prac. 2d § 138:5 (Dec. 2006)). As such, the Local Rules permit mediation of the issues relating to the Involuntary Petition. The Court's authority to order mediation relating to the Involuntary Petition may also be found in its broad equitable powers conferred pursuant to section 105(a) of the Bankruptcy Code, which provides that the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

Local Rule 9019(a) further provides that the court may "stay the contested matter or adversary proceeding in whole or in part for a specified time or until further order of the court to facilitate the settlement process." LR 9019(a)(2). In addition, Bankruptcy Rule 9006 provides that, subject to limited exceptions, a court for cause may enlarge the time in which a party has to act under the Bankruptcy Rules. Fed. R. Bankr. P. 9006(b)(1). This general rule applies to the twenty-one day period for filing a response to an involuntary petition prescribed in Bankruptcy Rule 1011(b). *See* Fed. R. Bankr. P. 9006(b)(2), (b)(3) (enlargement of time fixed by Bankruptcy Rule 1011(b) neither excepted from Bankruptcy Rule 9001(b)(1) nor governed by other rules). As such, the Court has ample authority to defer Mr. Ritter's response date pending the mediation.

Good cause exists to grant the relief requested in the Motion. The alternative to mediation is immediate litigation of the Involuntary Petition, followed, if an order for relief is entered, by litigation over various bankruptcy issues. These issues are likely to include the validity of certain claims against Mr. Ritter, and the contours of his estate. Given the complexity of Mr. Ritter's financial affairs as an active investor and entrepreneur, this litigation would be complex and protracted.

Mediation would allow Mr. Ritter, the Petitioning Creditors, and other creditors of Mr. Ritter that choose to participate to "address issues in a cooperative manner." *In re City of Detroit*, 519 B.R. 673, 681 (Bankr. E.D. Mich. 2014) (internal quotations omitted). This is preferable to the litigation alternative which is "costly and time-consuming, and most often its results are that the winner takes all and the loser gets nothing." *Id*. Moreover, in light of what is at stake, all parties in interest would be highly incentivized to participate in the mediation process in good faith. A chapter 7 liquidation of the property which would comprise Mr. Ritter's bankruptcy estate would surely destroy value. An alternative process, reached consensually, would likely maximize value while simultaneously limiting transaction costs.

### A. If Mediation Is Not Ordered, Mr. Ritter Has Substantial Grounds for Obtaining a Dismissal of the Involuntary Petition and Would Be Entitled to Costs and Other Amounts from the Petitioning Creditors

Where a debtor has more than twelve creditors, an involuntary petition may be commenced only by three or more entities holding unsecured claims aggregating at least $15,325 and which claims are, among other things, are "not contingent as to liability or the subject of a bona fide dispute *as to liability or amount*." 11 U.S.C. § 303(b)(1) (emphasis added). The phrase "as to liability or amount" was added to the Bankruptcy Code in 2005 pursuant to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 ("**BAPCPA**"). Whereas prior to BAPCPA a dispute as to amount was immaterial unless it called into question whether the value of the petitioning creditors' claims met the statutory threshold, this Court has concluded that petitioning creditors now must each hold liquidated claims. Likewise, the Bankruptcy Appellate Panel for the Ninth Circuit (the "**BAP**") has recognized that this is likely the case.

In *In re Blixseth*, No. 11-15010-mkn, D.I. 528 (Bankr. D. Nev. July 10, 2013) (attached hereto as **Exhibit B**), Judge Markell held that, following the BAPCPA amendments, "Section 303(b)(1) should now be construed to disqualify petitioning claims based on any bona fide dispute as to amount, even if some 'portion' of the claim is undisputed." *Id.* at 13. He explained that this reading was consonant with both the legislative history of current section 303 and with the legislative history of the Bankruptcy Act. In 1962, the Act was amended to remove the requirement that a creditor hold a liquidated claim to participate as a petitioning creditor. *Id.* "The reinsertion in 2005 of language similar to that which was deleted in 1962 must be understood to mean that Congress intended to disqualify the very claims that Congress sought to qualify in 1962 for purposes of an involuntary petition." *Id.* at 13-14. On appeal to the District Court, the *Blixseth* petitioning creditor sought and obtained certification to the Ninth Circuit based on what the District Court characterized as a split in authority on the issue. *See* No. 2:13-cv-01324-JAD (D. Nev. Sept. 25, 2013). The Ninth Circuit, however, declined the invitation to review the matter directly, *see* No. 13-80215 (9th Cir. June 11, 2014), and the appeal now remains pending before the District Court.

In an earlier BAP decision, also signed by Judge Markell, the panel cited favorably cases concluding that BAPCPA disqualified holders of unliquidated claims from filing an involuntary petition. In *C&C Jewelry Mfg. v. Laxmi Jewel Inc. (In re C&C Jewelry Mfg.)*, 2009 Bankr. LEXIS 4516 (B.A.P. 9th Cir. Apr. 10, 2009), the panel recognized that the pre-BAPCPA rule was that "a dispute over the amount of a debt is not considered a 'bona fide dispute' under § 303(b) unless the dispute arises from the same transaction and the alleged debtor's counterclaims or offsets, if netted out, would take the total debt below the statutory threshold." *Id.* at *16-17(citing *Focus Media, Inc. v. Nat'l Broad Co. (In re Focus Media, Inc.)*, 378 F.3d 916, 926 (9th Cir. 2004). The panel acknowledged that the Ninth Circuit had not yet addressed the issue post-BAPCPA, but observed that "other courts have held that an objective legitimate dispute as to an amount owed on a petitioning creditor's claim is sufficient to demonstrate a bona fide dispute and forestall a petitioning creditor from maintaining an involuntary petition under § 303(b)." *Id.* at *18 (citing *In re Mountain Dairies, Inc.*, 372 B.R. 623, 633-34 (Bankr. S.D.N.Y. 2007); *In re Euro-Am. Lodging Corp.*, 357

B.R. 700, 712 (Bankr. S.D.N.Y. 2007); *Reg'l Anesthesia Assocs. PC v. PHN Physician Servs., Inc.* (*In re Reg'l Anesthesia Assocs. PC*), 360 B.R. 466, 470 (Bankr. W.D. Penn. 2007)). Ultimately, the *C&C Jewelry Panel* did not decide whether a creditor holding an unliquidated claim had standing to bring an involuntary petition because the petitioning creditors failed to show that their claims were undisputed "even as to a threshold amount." *Id.* at *19.

At least one other court within the Ninth Circuit has concluded that a petitioning creditor must hold a liquidated claim in order to participate as a petitioning creditor under section 303(b) of the Bankruptcy Code. *See In re Excavation, Etc., LLC*, No. 09-60953-fra7, 2009 Bankr. LEXIS 1905, at *4-6 (Bankr. D. Or. June 24, 2009). These in-circuit authorities are persuasive and show that the Involuntary Petition was improperly filed against Mr. Ritter.

The burden of proving eligibility to commence an involuntary petition lies with the petitioning creditors. *C&C Jewelry*, 2009 Bankr. LEXIS 4516, at *20 (citing *Liberty Tool & Mfg. v. Vortex Fishing Sys., Inc.* (*In re Vortex Fishing Sys., Inc.*), 277 F.3d 1057, 1064 (9th Cir. 2002)). Once met, the *C&C Jewlerly* panel posited that, following BAPCPA, the debtor may defeat the petition by showing that there exists "an 'objective basis for either a factual or legal dispute as to the amount or the liability of the petitioning creditors' claims.'" *Id.* (quoting *In re C.W. Mining Co.*, No. 08-20105, 2008 Bankr. LEXIS 2913, *3 (Bankr. D. Utah Sept. 17, 2008) (internal modification omitted)). Multibank cannot meet its burden to show its eligibility as a petitioning creditor and Mr. Ritter can easily show that Multibank's claim is subject to a manifest objective dispute.

First, Multibank asserts in the Involuntary Petition only the amount of its alleged claim as of December 15, 2015—two and a half months prior to the Petition Date. This is inadequate. *See C&C Jewelry*, 2009 Bankr. LEXIS 4516, at *22 ("[T]his document does not establish a definitive amount of money owed to [the petitioning creditors] as of the Petition Date.").

More importantly, as set forth above, to the extent Multibank holds any claim at all,[4] such claim is a disputed and unliquidated claim under Nevada law. Absent a determination of the value

---

[4] Mr. Ritter makes no admissions and reserves all defenses in respect of the claims asserted in the Involuntary Petition.

of the Multibank Collateral, Multibank *cannot* obtain a liquidated judgment against Mr. Ritter pursuant to NRS § 40.495(4). Under that provision, a guarantor is entitled to a credit for the value of any real property collateral securing the underlying obligation. Multibank has baldly asserted its claim without *any* provision or adjustment for the value of the Multibank Collateral. On its face, Multibank's asserted claim is subject to dispute and unliquidated. Indeed, if the Multibank Collateral has any value at all (which it does), Multibank's asserted claim is manifestly false.

Further, it appears on its face that Multibank's claim is subject to a complete statute of limitations defense, at least as to the Alleged Debtor. An affirmative defense such as statute of limitations was sufficient to give rise to a bona fide dispute even before BAPCPA. *Vortex Fishing*, 277 F.3d 1057, 1067 (9th Cir. 2002). BAPCPA did not change this. Even as substantial disagreement over which statute of limitations applies to a claim is enough to constitute a bona fide dispute. *Id.*

To the extent that Mr. Ritter were to prevail on a motion to dismiss the Involuntary Petition—which would be likely in light of the foregoing—he would be entitled to his costs. *See* 11 U.S.C. § 303(i)(1). In addition, to the extent that a petition based on an unliquidated claim stated in a manifestly false amount under the circumstances constitutes bad faith, one or more of the Petitioning Creditors could be subject to punitive damages or be liable for consequential damages caused to Mr. Ritter. *Id.* at § 303(i)(2). Mr. Ritter reserves all of his rights under section 303(i)(1) and (i)(2) of the Bankruptcy Code.

**B.     A Mediation Is Likely to Produce a Better Path Forward Than the Chapter 7 Liquidation Proceeding Sought by the Petitioning Creditors**

The Involuntary Petition seeks relief under chapter 7 of the Bankruptcy Code. An order for relief under chapter 7 would immediately destroy value. Section 701 of the Bankruptcy Code calls for the immediate appointment of a trustee following an order for relief under chapter 7. 11 U.S.C. § 701(a)(1). While this may be desirable in the ordinary case, it would have devastating consequences here.

Among other things, much of the value of Mr. Ritter's assets is held in business ventures as to which Mr. Ritter actively participates in management and operations. Were a chapter 7 trustee to take possession of these interests, he or she would face at least two significant impediments to realizing value from them. First, the trustee would not be able to exercise control rights to the extent that doing so would frustrate the expectations of other investors. *See, e.g.*, *In re Harms*, 10 B.R. 817, 821 (Bankr. D. Colo. 1981) ("It is obvious that the Trustee cannot assume the position of general partner of these limited partnerships, since he is not the person with whom the limited partners contracted."); *In re Allentown Ambassadors, Inc.*, 361 B.R. 422, 456 (Bankr. E.D. Pa. 2007) (finding the reasoning in *Harms* applies equally in the LLC context). Second, the trustee would lose the benefit of Mr. Ritter's irreplaceable knowledge and expertise in operating the entities and conducting their businesses. Were Mr. Ritter to lose his economic interest in his various business ventures, he would have little or no incentive to assist the trustee in realizing their value.

Through a mediation process, Mr. Ritter, the Petitioning Creditors, and other creditors that may choose to participate would have the opportunity to consider alternatives to a value destroying chapter 7 proceeding. Mr. Ritter is confident that an effective mediation process led by a sitting bankruptcy judge such as Judge Zive—necessarily a person with a clear understanding of the potential outcomes and commanding the respect of all persons involved—would yield a superior result for all parties in interest. Indeed, a consensual chapter 11 plan presents an obvious avenue for fairly allocating value that would otherwise be lost in a chapter 7, and Judge Zive, or such other sitting bankruptcy judge who may be available, would be an ideal person to assist the parties in designing a mutually agreeable plan likely to achieve confirmation.

Importantly, creditors will be protected for the duration of a mediation process. The filing of the Involuntary Petition automatically imposed a stay pursuant to section 362(a) of the Bankruptcy Code. Therefore, creditors need not worry that any rival claim holder will obtain an advantage in collecting against Mr. Ritter while mediation is ongoing. 11 U.S.C. § 362(a). Moreover, to the extent an order for relief is ultimately entered, the trustee will have the power pursuant to

section 549(a) to recover any payments to prepetition creditors after the Petition Date without regard to any preference defenses. *Id.* at § 549(a), (b).

In short, a mediation process is a low risk high reward proposition. It is clearly preferable to the high risk low reward alternative of descending immediately into litigation. Mediation is in the best interests of Mr. Ritter's putative estate and all parties in interest.

Mr. Ritter proposes that the mediation process requested by this Motion last not fewer than sixty (60) days. This will provide adequate time for creditors to become involved in the process, understand Mr. Ritter's financial condition, and for the parties to jointly explore—and hopefully agree upon—a consensual and constructive path forward.

Notably, even if only the issues surrounding the Involuntary Petition are resolved through the Mediation Process, the period requested is shorter than the time that would be required to litigate those issues.

### C.   The Court Should Stay the Bankruptcy Case for the Duration of the Mediation or Otherwise Extend the Time for Mr. Ritter to Respond to the Involuntary Petition

Except for the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code, the Court should stay the Bankruptcy Case for the duration of the requested mediation. Absent a stay, the parties will be thrust immediately into litigation concerning the propriety of the Involuntary Petition. This would not be conducive to a productive mediation process.

By expressly authorizing the stay of a "contested matter or adversary proceeding in whole or in part" for the duration of an alternative dispute resolution process, Local Rule 9019(a)(2) impliedly recognizes that a stay is likely to promote a successful mediation. This is self-evident in this case. The purpose of a mediation here is to forestall expensive and time-consuming litigation. Without a stay, that litigation would begin within the month and would likely derail any talks which had begun by that time.

In the alternative, the same reasons that a stay would be appropriate constitute cause under Bankruptcy Rule 9006(b) for delaying the deadline for Mr. Ritter to respond to the Involuntary

Petition under Bankruptcy Rule 1011(b) until after a reasonable period following the conclusion of the mediation.

## CONCLUSION

For all of the foregoing reasons, Mr. Ritter respectfully requests that the Court (a) enter an order substantially in the form attached hereto as **Exhibit A**; and (b) grant such other and further relief as the Court deems just and proper.

Dated: March 7, 2016                                         **WHITE & CASE LLP**


By: /s/ Roberto J. Kampfner
Roberto J. Kampfner
California State Bar No. 179026
555 South Flower Street, Suite 2700
Los Angeles, CA  90071
Telephone: (213) 620-7700
Facsimile:  (213) 452-2329
rkampfner@whitecase.com

**SCHWARTZ FLANSBURG PLLC**

/s/Samuel A. Schwartz, Esq.
Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
Bryan A. Lindsey, Esq.
Nevada Bar No. 10662
6623 Las Vegas Blvd. South, Suite 300
Las Vegas, Nevada 89119
Telephone: (702) 385-5544
Facsimile: (702) 385-2741

*Counsel for the Alleged Debtor*

Americas 91123856 v1

16

MOTION FOR ORDER (A) DIRECTING MEDIATION; AND (B) STAYING, IN PART, INVOLUNTARY BANKRUPTCY PROCEEDING