Roberto J. Kampfner
California Bar No. 179026
rkampfner@whitecase.com
**WHITE & CASE LLP**
555 South Flower Street, Suite 2700
Los Angeles, CA 90071
Telephone: (213) 620-7700
Facsimile: (213) 452-2329

Samuel A. Schwartz
Nevada Bar No. 10985
sam@nvfirm.com
Bryan A. Lindsey
Nevada Bar No. 10662
bryan@nvfirm.com
**SCHWARTZ FLANSBURG PLLC**
6623 Las Vegas Boulevard South, Suite 300
Las Vegas, NV 89119
Telephone: (702) 385-5544
Facsimile: (702) 385-2741

*Attorneys for the Alleged Debtor*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| IN RE<br><br>JOHN A. RITTER<br><br>Alleged Debtor | CASE BK-16-10933-BTB<br><br>CHAPTER 7 (Involuntary)<br><br>**MOTION TO DISMISS INVOLUNTARY CHAPTER 7 BANKRUPTCY PETITION AND RESERVATION OF RIGHTS UNDER 11 U.S.C. § 303(i)**<br><br>Hearing Date: _____<br>Hearing Time: _____<br>Estimated Time for Hearing: 3 hours |

Americas 91156852 v4

John A. Ritter ("**Mr. Ritter**," or, the "**Alleged Debtor**") hereby files his (i) motion to dismiss the *Involuntary Petition Against an Individual* [D.I. 1] (the "**Involuntary Petition**") filed against him on February 29, 2016 (the "**Petition Date**") by Multibank 2009-1 RES-ADC Venture, LLC ("**Multibank**"), Pacific Western Bank ("**PWB**"), and SV Litigation SPE, LLC ("**SV Litigation**," and, together with Multibank and PWB, the "**Petitioning Creditors**"); and (ii) reservation of rights under subsection 303(i) of title 11 of the United States Code (the "**Bankruptcy Code**").  In support thereof Mr. Ritter states as follows:

## PRELIMINARY STATEMENT

This bankruptcy case was improperly commenced.  The Bankruptcy Code is clear: three creditors holding claims "not subject of a bona fide dispute as to liability or amount" must join an involuntary petition where, as is true of Mr. Ritter, the alleged debtor has at least twelve creditors.  This most basic requirement is not satisfied in this case.

There are just three Petitioning Creditors, which means that each one must pass muster for relief to be granted.  Multibank's claim is unliquidated as a matter of law.  It is a guarantee claim relating to a primary obligation secured by real property.  Under Nevada law, Mr. Ritter, as a guarantor, can be liable only for the amount of any deficiency after accounting for the value of the collateral securing the primary obligation.  The claim that Multibank asserts as a Petitioning Creditor gives *no* credit for the value of Multibank's collateral.  Not only does this mean that Multibank's claim is unliquidated and therefore subject to a bona fide dispute as to amount; it means it is manifestly false.  It simply cannot be (and is not) the case that the land against which Multibank lent over $10 million is worth $0.00.

The Petitioning Creditors' willingness to proceed on the basis of such a claim independently supports dismissal of the Involuntary Petition on the basis of bad faith.  Petitioning creditors are under an obligation to understand their own claims and the claims of their co-creditors, as well as the applicable law governing their claims and their eligibility to support an involuntary petition.  Failure to do so evidences a lack of good faith.  So too do other circumstances surrounding the filing.

For these, reasons, and as more fully set forth herein, the Court should dismiss the involuntary petition filed against Mr. Ritter.

# BACKGROUND INFORMATION

### A.   The Alleged Debtor

Mr. Ritter, through various entities under the umbrella of Focus Property Group[1] ("**Focus**"), has been engaged in the business of land development for a substantial portion of his professional life. Mr. Ritter is the majority owner of Focus, holding or controlling, directly or indirectly, just over half of the equity interests in the enterprise.

Consistent with prevailing practices in real estate lending and given how Focus developed out over the years, the one common element of all Focus's financing was that Mr. Ritter was required to sign personal guarantees on essentially all of the debt. In addition to direct personal guarantees on loans, Mr. Ritter was required to sign personal guarantees on huge bonding programs for various development projects.

Starting in 2008, the economy in general, and the Focus family of entities in particular, came under significant financial pressure. The combination of a severely tightening real estate market and an almost complete freeze of the credit markets caused the Focus entities to be unable to sell property, refinance debt as it matured, or continue making payments on their various loan obligations as they became due. As a result, in February of 2008, Focus missed interest payments on approximately $500 million of loans. By the end of 2008 Focus was in a similar position with respect to most of its other debt as well.

Focus's troubles, over time, had an adverse impact on Mr. Ritter, personally. Nevertheless, Mr. Ritter has always worked to resolve his liabilities in a reasonable, fair and consensual manner. While this has been successful in the vast majority of cases, it has not yet been with respect to the relatively small handful of creditors remaining, including the Petitioning Creditors.

### B.   Commencement of the Involuntary Bankruptcy Case

On the Petition Date, the Petitioning Creditors commenced the above-captioned case (the "**Bankruptcy Case**") against Mr. Ritter by filing the Involuntary Petition pursuant to section 303 of the Bankruptcy Code.

---

[1] Focus Property Group is a name which is used to generally describe a family of investment and operational entities.

Service of the Involuntary Petition and related summons on Mr. Ritter was effected by agreement of counsel on March 2, 2016 pursuant to Rule 5(b)(2)(E) of the Federal Rules of Civil Procedure, made applicable in these proceedings pursuant to Rules 1018 and 7005 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

In the Involuntary Petition, the Petitioning Creditors allege that Mr. Ritter is generally not paying his debts as they come due. Involuntary Petition, 3. The Petitioning Creditors further allege that they hold (or at least recently held) claims in the aggregate amount of $25,623,806.39 plus applicable fees, costs, and interest. *Id.* at Ex. 1. This amount is comprised of (a) a judgment against Mr. Ritter held by PWB in the amount of $3,369,448.67; (b) a judgment against Mr. Ritter held by SV Litigation in the amount of $2,762,089.96; and (c), in the case of Multibank, a "Commercial Guaranty & Forbearance Letter Agreement" purportedly evidencing a claim which, as of December 15, 2015, allegedly stood at $19,492,267.67.[2] *Id.*

Importantly, Multibank does not have a judgment against Mr. Ritter. As recited in the Forbearance Letter Agreement referenced in the Involuntary Petition (the "**Multibank Forbearance Letter Agreement**"), which was prepared and signed by Multibank, the basis for Multibank's claim against Mr. Ritter is his guaranty of the obligations of a Focus entity in respect of a commercial loan secured by real property. Specifically, the Multibank Forbearance Letter Agreement provides that:

> The Loan is evidenced and secured by, among other documents and instruments, (i) a Promissory Note dated November 22, 2006, in the original principal amount of $10,111,000 . . . , by [PV Land Investments, LLC (the "**Original Borrower**")], as maker, payable to the order of Lender [(the "**Multibank Note**")]; (ii) a Deed of Trust dated as of November 22, 2006, and recorded as Instrument 673104, Official Records of Nye County, Nevada, and a Water Rights Deed of Trust dated as of November 22, 2006, and recorded as Instrument 676755, Official Records of Nye County, Nevada [(collectively, the "**Multibank Deed of Trust**")], and encumbering certain property described therein [(the "**Multibank Collateral**")]; (iii) a Business Loan Agreement dated as of November 22, 2006, by and between Lender and Original Borrower [(the "**Multibank Loan Agreement**")], (iv) Commercial Guaranties dated as of November 22, 2006 [(collectively, the "**Multibank Guaranties**")], by Focus Contribution, LLC . . ., Holdings Manager, Inc. . . ., John A. Ritter, trustee of Mustang Trust, and John A. Ritter [(collectively, the "**Multibank Guarantors**")] in favor of [Multibank]; and (v) certain other Related Documents as defined in the [Multibank] Loan Agreement [(collectively, the "**Multibank Loan Documents**")].

---

[2] Upon information and belief, Multibank was assigned the obligations underlying the Forbearance Letter Agreement from the Federal Deposit Insurance Corporation. Mr. Ritter reserves all rights with regard to the validity of that assignment and all other matters relating to Multibank's claim, including, without limitation, the allowability of such claim.

1  Multibank Forbearance Letter Agreement, 1.

2  Under Nevada law, the claim against a guarantor of debt secured by real property is limited
3  to the difference between the amount guaranteed and the value of the collateral securing the primary
4  obligation. *See* NRS § 40.495. The amount of the claim alleged by Multibank in the Involuntary
5  Petition reflects the entire amount of the Multibank Note (plus interest) *without* credit for the value
6  of the Multibank Collateral. Indeed, the value of the Multibank Collateral has not been determined.
7  Because the value of the Multibank Collateral is not reflected in the amount of Multibank's claim
8  alleged in the Involuntary Petition and because that collateral has yet to be valued, Multibank's
9  claim is not liquidated.

10  Additionally, PWB's participation as a Petitioning Creditor raises concerns about the good
11  faith of the Petitioning Creditors, particularly in light of the objective dispute surrounding the value
12  of Multibank's claim. Before the Involuntary Petition was filed, on February 8, 2016, counsel to Mr.
13  Ritter furnished counsel to PWB with a settlement agreement[3] containing terms which may be read
14  to provide that $18.5 million in extinguished claims against Mr. Ritter will be revived if, prior to
15  May 16, 2017, he becomes the subject of an involuntary petition which is not dismissed within
16  ninety days. The Petition Date came just three weeks later.

17  On the basis of the foregoing facts, and for the additional reasons set forth below, Mr. Ritter
18  brings this motion.

**RELIEF REQUESTED**

Mr. Ritter requests that the Court (i) dismiss the Involuntary Petition; and (ii) grant such other and further relief as may be appropriate under the circumstances. Without limiting the generality of the foregoing, Mr. Ritter expressly reserves his right to judgment under subsection 303(i) of the Bankruptcy Code.

**JURISDICTION**

This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and Rule 1001(b)(1) of the Local Rules of Bankruptcy Practice of the United States District Court for the District of Nevada (the "**Local Rules**") (incorporated as Part III of the Local Rules of Practice for

---

[3] Mr. Ritter makes no admissions with respect to such agreement, including, without limitation, with respect to the validity, enforceability, or proper interpretation thereof.

the United States District Court for the District of Nevada). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BASIS FOR RELIEF REQUESTED

### A. The Involuntary Petition Must Be Dismissed Because It Was Not Filed by the Requisite Number of Qualified Petitioning Creditors

The Involuntary Petition was commenced by three creditors—the minimum number of creditors allowable under the circumstances. An infirmity as to any claim therefore must result in the dismissal of the Involuntary Petition. The claim asserted by Multibank is infirm for the purposes of filing an involuntary petition because it is subject to bona fide dispute as to amount. Accordingly, the Involuntary Petition must be dismissed.

#### 1. Any Dispute as to Amount Renders a Claims Subject to Bona Fide Dispute

Where a debtor has more than twelve creditors, an involuntary petition may be commenced only by three or more entities holding unsecured claims aggregating at least $15,325 and which claims are, among other things, are "not contingent as to liability or the subject of a bona fide dispute *as to liability or amount*." 11 U.S.C. § 303(b)(1) (emphasis added).

The phrase "as to liability or amount" was added to the Bankruptcy Code in 2005 pursuant to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 ("**BAPCPA**").[4] In the wake of BAPCPA, the majority of courts to decide or comment on the issue have concluded that petitioning creditors now must each hold fully liquidated claims. This Court is among those that have expressly adopted the majority view. Likewise, the Bankruptcy Appellate Panel for the Ninth Circuit (the "**BAP**") has recognized that the majority view is likely correct.

In *In re Blixseth*, No. 11-15010-mkn, D.I. 528 (Bankr. D. Nev. July 10, 2013) (attached hereto as **Exhibit A**), Judge Markell held that, following the BAPCPA amendments, "Section 303(b)(1) should now be construed to disqualify petitioning claims based on any bona fide dispute as to amount, even if some 'portion' of the claim is undisputed." *Id.* at 13. He explained that this reading is consonant with both the legislative history of current section 303 and with the legislative

---

[4] Prior to BAPCPA a dispute as to amount was immaterial unless it called into question whether the value of the petitioning creditors' claims, in the aggregate, met the statutory threshold.

1   history of the Bankruptcy Act.  In 1962, the Act was amended to remove the requirement that a

2   creditor hold a liquidated claim to participate as a petitioning creditor.  *Id.*  "The reinsertion in 2005

3   of language similar to that which was deleted in 1962 must be understood to mean that Congress

4   intended to disqualify the very claims that Congress sought to qualify in 1962 for purposes of an

5   involuntary petition."  *Id.* at 13-14.

6         On appeal to the District Court, the *Blixseth* petitioning creditor sought and obtained

7   certification to the Ninth Circuit based on a split among various bankruptcy courts on the issue.  *See*

8   No. 2:13-cv-01324-JAD, D.I. 33 (D. Nev. Sept. 25, 2013).  The Ninth Circuit, however, declined the

9   invitation to review the matter directly, *see* No. 13-80215 (9th Cir. June 11, 2014), and the appeal

10  now remains pending before the District Court.

11        In an earlier BAP decision, also signed by Judge Markell, the panel cited favorably cases

12  concluding that BAPCPA disqualified holders of unliquidated claims from filing an involuntary

13  petition.  In *C&C Jewelry Mfg. v. Laxmi Jewel Inc.* (*In re C&C Jewelry Mfg.*), 2009 Bankr. LEXIS

14  4516 (B.A.P. 9th Cir. Apr. 10, 2009), the panel recognized that the pre-BAPCPA rule was different

15  and acknowledged that the Ninth Circuit had not yet addressed the issue post-BAPCPA, but

16  observed that "other courts have held that an objective legitimate dispute as to an amount owed on a

17  petitioning creditor's claim is sufficient to demonstrate a bona fide dispute and forestall a petitioning

18  creditor from maintaining an involuntary petition under § 303(b)."  *Id.* at *18 (citing *In re Mountain

19  Dairies, Inc.*, 372 B.R. 623, 633-34 (Bankr. S.D.N.Y. 2007); *In re Euro-Am. Lodging Corp.*, 357

20  B.R. 700, 712 (Bankr. S.D.N.Y. 2007); *Reg'l Anesthesia Assocs. PC v. PHN Physician Servs., Inc.*

21  (*In re Reg'l Anesthesia Assocs. PC*), 360 B.R. 466, 470 (Bankr. W.D. Penn. 2007)).  Ultimately, the

22  *C&C Jewelry Panel* did not decide whether a creditor holding an unliquidated claim had standing to

23  bring an involuntary petition because the petitioning creditors failed to show that their claims were

24  undisputed "even as to a threshold amount."  *Id.* at *19.

25        At least one other court within the Ninth Circuit has concluded that a petitioning creditor

26  must hold a liquidated claim in order to participate as a petitioning creditor under section 303(b) of

27  the Bankruptcy Code.  *See In re Excavation, Etc., LLC*, No. 09-60953-fra7, 2009 Bankr. LEXIS

28

1  1905, at *4-6 (Bankr. D. Or. June 24, 2009).  These in-circuit authorities are persuasive and show
2  that the Involuntary Petition was improperly filed against Mr. Ritter.
3        Additionally, following *Blixseth*, *C&C Jewelry*, and *Excavation, Etc.*, appellate courts
4  outside of Ninth Circuit, including at the circuit level, have interpreted the post-BAPCPA petitioning
5  creditor requirements to include that their claims be fully liquidated.  The Fifth Circuit in *Credit*
6  *Union Liquidity Services, L.L.C. v. Green Hills Development Company* (*In re Green Hills*
7  *Development Company*), 741 F.3d 651, 657 (5th Cir. 2014) recognized that Congress "changed [the]
8  meaning" of section 303(b) by adding the phrase "as to liability or amount" such that a dispute as to
9  amount is now sufficient to constitute a bona fide dispute and thereby disqualify the claim of a
10 petitioning creditor.
11       More recently in *Farmers & Merchants State Bank v. Turner*, 518 B.R. 642 (N.D. Fla. 2014),
12 the District Court for the Northern District of Florida affirmed dismissal of a bankruptcy case under
13 circumstances remarkably similar to those presented in Mr. Ritter's case.  In *Turner*, three creditors
14 filed an involuntary petition for relief under chapter 7 of the Bankruptcy Code against Douglas
15 Turner, a former principal of a real estate development company.  *Id.* at 645.  The petitioning
16 creditors' claims arose from Mr. Turner's guarantees of loans that they had made to the company.
17 *Id.*  The company had undergone a chapter 11 process and was reorganized pursuant to a plan.  *Id.*
18 While the company's chapter 11 process was ongoing, each of the petitioning creditors obtained a
19 judgment against Mr. Turner in the face amount of the company's outstanding obligations to them.
20 In the case of the appellant, Farmers & Merchants State Bank (the "**Bank**"), that judgment was
21 $3,489,142.39.  Pursuant to the company's plan, the Bank received its collateral (stipulated for the
22 purposes of the plan to be worth $1.1 million) and stock in the reorganized company.  *Id.*  In joining
23 the involuntary petition against Mr. Turner, the Bank nonetheless asserted all $3,489,142.39 of its
24 judgment.
25       The bankruptcy court dismissed the case against Mr. Turner because a bona fide dispute
26 existed as to the amount of the Bank's claim (as well as the claims of the other petitioning creditors
27 on similar grounds).  "The Bankruptcy Court noted that the Bank's claim was based on the full
28 amount of the judgment [against Mr. Turner], with no credit having been given for the property or

1  stock [distributed pursuant to the primary obligor's plan], and thus there was a bona fide dispute as
2  to amount because it could not tell whether the Bank's claim had been paid in full or in part." *Id.* at
3  650.  It did not matter that Mr. Turner failed to establish the value of the credit to which he was
4  entitled based on consideration the Bank received under the plan: "[W]here Turner has established
5  that substantial credits must be given against the judgment based on the value of the property and the
6  stock, the fact that Turner did not prove the exact valuation of the stock does not preclude a finding
7  that a bona fide dispute exists.  The Bankruptcy Court was not required to resolve the dispute but
8  only identify whether or not a bona fide dispute was present." *Id.*

The *Turner* court further "disagree[d] with the Bank's argument that the Bankruptcy Court erred by not requiring Turner to demonstrate a bona fide dispute in an amount sufficient to call into question whether the aggregate claims met the statutory threshold." *Id.* 651.  The court chose to address this issue even through the Bank had failed to raise it before the bankruptcy court. *Id.*  It found that "the majority of courts that have addressed the issue, or commented on it, have concluded that the [BAPCPA] amendment changed the analysis such that now *any* dispute as to amount (whether implicating the statutory threshold or not) renders a creditor ineligible [to join an involuntary petition]." *Id.* at 652 (emphasis in original).  It continued, "[t]his interpretation appears to be consistent with the plain language of the statute and Congress's intent to disqualify a creditor whose claim is subject to dispute from using an involuntary petition 'as a club to coerce the debtor' to satisfy a judgment when substantial questions may remain as to liability *or* amount." *Id.* (quoting *In re Rosenberg*, 414 B.R. 826, 845-46 (Bankr. S.D. Fla. 2009)) (emphasis in original).

This court should follow "the majority of courts that have addressed the issue, or commented on it"— including Judge Markell in *Blixseth* and the BAP in *C&C Jewelry*—as well as "the plain language of the statute and Congress's intent" in finding that any dispute as to the amount of a claim disqualifies its holder from joining an involuntary petition.

### 2. Petitioning Creditors Must Prove Eligibility to Commence an Involuntary Bankruptcy Case

The burden of proving eligibility to commence an involuntary petition lies with the petitioning creditors.  *C&C Jewelry*, 2009 Bankr. LEXIS 4516, at *20 (citing *Liberty Tool & Mfg. v. Vortex Fishing Sys., Inc.* (*In re Vortex Fishing Sys., Inc.*), 277 F.3d 1057, 1064 (9th Cir. 2002)).

Once met, the *C&C Jewelry* panel posited that, following BAPCPA, the debtor may defeat the petition by showing that there exists "an 'objective basis for either a factual or legal dispute as to the amount or the liability of the petitioning creditors' claims.'" *Id.* (quoting *In re C.W. Mining Co.*, No. 08-20105, 2008 Bankr. LEXIS 2913, *3 (Bankr. D. Utah Sept. 17, 2008) (internal modification omitted)). "The bankruptcy court need not resolve the merits of the bona fide dispute, but simply determine whether one exists." *Platinum Fin. Servs. Corp. v. Byrd* (*In re Byrd*), 357 F.3d 433, 437 (4th Cir. 2004).

Multibank cannot meet its burden to show its eligibility as a petitioning creditor. For the reasons set forth below, Multibank's claim is subject to a manifest objective dispute.[5]

### 3. Multibank's Claim Is Subject to a Bona Fide Dispute

To the extent Multibank holds any claim at all, such claim is disputed and unliquidated. As noted above, Nevada law provides that the guarantor of an obligation secured by real property is liable only for the amount by with the obligation exceeds the value of the collateral. This is true whether or not a foreclosure has occurred. Here, Multibank has not foreclosed upon the Multibank Collateral. Accordingly, NRS § 40.495(4) applies and provides, in relevant part:

> If, before a foreclosure sale of real property, the obligee commences an action against a guarantor . . . to enforce an obligation to pay . . . all or part of an . . . obligation secured by a mortgage or lien upon the real property:
>
> (a) The court must hold a hearing and take evidence . . . concerning the fair market value of the property as of the date of the commencement of the action. . . .
>
> (b) After the hearing, if the court awards a money judgment against the guarantor . . . who is personally liable for the debt, the court must not render judgment for more than:
>
> > (1) The amount by which the amount of the indebtedness exceeds the fair market value of the property as of the date of the commencement of the action; or
> >
> > (2) If a foreclosure sale is concluded before a judgment is entered, the amount that is the difference between the amount for which the property was actually sold and the amount of the indebtedness which was secured,

---

[5] Nothing herein shall constitute a waiver of any additional defenses, counterclaims, offsets, or the like that Mr. Ritter has in respect of Multibank's claim or any claim asserted by any Petitioning Creditor. Mr. Ritter makes no admissions as to the validity, enforceability, or amount of such claims.

1 whichever is the lesser amount.

2 In short, Multibank *cannot* obtain a judgment against Mr. Ritter unless and until the value of
3 the Multibank Collateral is determined through a judicial proceeding or actual sale.  And, any
4 judgment that Multibank can obtain against Mr. Ritter will be determined, in part, based upon that
5 valuation.  Because Multibank has not obtained a determination of the value of the Multibank
6 Collateral in accordance with NRS § 40.495(4) or even commenced an action against Mr. Ritter—a
7 further perquisite for getting a judgment—Multibank's claim is subject to bona fide dispute as to
8 amount and Multibank cannot be counted as a qualified petitioning creditor.  Put another way, so
9 long as the variable which is the value of the Multibank Collateral is unknown, the value of the
10 Multibank claim is unknowable.

11 The parallels between Multbank's claim and the Bank's claim in *Turner* are sufficient that
12 the *Turner* court's analysis applies directly to this case.  Indeed, the Bank's claim in Turner was
13 *more* definite than Multibank's claim.  The Bank had an actual judgment against Turner in the exact
14 amount of its asserted claim.  In contrast, Multibank's claim is based on a Multibank Guarantee and
15 the Multibank Forbearance Letter Agreement.  Neither of these documents is attached to the
16 Involuntary Petition and neither reflects the amount of the claim—"$19,492,267.67 as of Dec. 15,
17 2015 [plus further accruals]"—that Multibank asserts in the Involuntary Petition.  The Bank in
18 *Turner* had stipulated to the value of the collateral securing the primary obligation under Mr.
19 Turner's guarantee in connection with the primary obligor's chapter 11 plan.  Here, Multibank has
20 not even sought a determination of the value of the Multibank Collateral, much less obtained one as
21 it *must do* in order to fix the amount of any claim against Mr. Ritter.

22 The Bank's claim in *Turner* was found to be subject to bona fide dispute disqualifying the
23 Bank as a petitioning creditor.  Multibank's claim actually presents a much easier case for reaching
24 the same conclusion.  Accordingly, Multibank's claim must be disregarded for the purposes of
25 evaluating the Involuntary Petition.

26 Finally, Multibank asserts in the Involuntary Petition only the amount of its alleged claim as
27 of December 15, 2015—two and a half months prior to the Petition Date.  This is inadequate.  *See*

28

1  *C&C Jewelry*, 2009 Bankr. LEXIS 4516, at *22 ("[T]his document does not establish a definitive
2  amount of money owed to [the petitioning creditors] as of the Petition Date.").

3  Because it was not filed by three creditors each holding non-contingent and liquidated
4  claims, the Involuntary Petition must be dismissed.  11 U.S.C. § 303(b).

5  **B.     The Involuntary Petition Is Subject to Dismissal Because It Was Filed in Bad Faith**

6  The Involuntary Petition should also be dismissed on the grounds that it was filed in bad
7  faith.  Courts generally recognize that a petition not filed in good faith is subject to dismissal.  A
8  petition is filed in bad faith if the petitioning creditors failed to adhere to the requirements of the
9  Bankruptcy Code.  For the reasons set forth above, the Petitioning Creditors did not hold the
10 requisite claims to file the Involuntary Petition under a plain reading of section 303(b) or the case
11 law interpreting it.

12 Additionally, a petition is filed in bad faith where it is used as a substitute for ordinary
13 collection methods.  The facts and circumstances of the Involuntary Petition indicate that, and upon
14 information and belief, PWB orchestrated the filing of the Involuntary Petition in an effort to coerce
15 Mr. Ritter to pay PWB's judgment against him.  Among other things, PWB filed the Involuntary
16 Petition shortly after being provided with a settlement agreement containing terms which may be
17 read to provide that $18.5 million in claims against Mr. Ritter could be revived if, prior to May 16,
18 2017, he becomes the subject of an involuntary petition which is not promptly dismissed.  PWB
19 likely viewed this clause as offering leverage for it to enforce its judgment against Mr. Ritter.

20 **1.     A Bad Faith Filing Warrants Dismissal**

21 It is clear from the Bankruptcy Code that, following dismissal of an involuntary petition
22 under section 303, the alleged debtor may recover punitive and consequential damages from any
23 creditor that filed the petition in bad faith.  11 U.S.C. § 303(i)(2).  While the Ninth Circuit has not
24 decided the issue,[6] the "majority of courts agree" that bad faith also constitutes an independent
25 ground for dismissal.  *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 335 (3d Cir. 2015).

---

[6]    *See Marciano v. Chapnick* (*In re Marciano*), 708 F.3d 1123, 1129 (9th Cir. 2013) (noting that the Bankruptcy Code does not expressly provide for dismissal based on bad faith but recognizing the "theoretical availability" of such a defense).

1    The Third Circuit recently joined that majority in holding "that an involuntary petition filed under 11 U.S.C. § 303 may be dismissed for bad faith." *Id.* Its conclusion rested on its interpretation of the Bankruptcy Code and the equitable nature of bankruptcy relief. First, it recognized that it would make little sense for Congress to penalize bad faith in section 303(i)(2) but still permit a bad faith filing to proceed against an alleged debtor. *Id.* at 334. Second, it noted that though creditors' failure to meet the technical requirements for an involuntary petition requires dismissal under section 303, satisfying the technical requirements does not make relief mandatory. *Id.* (citing 11 U.S.C. § 303(h)(1)). This gap permits a bankruptcy court to decline to enter an order for relief even if all technical requirements are satisfied. Bad faith is a proper reason to do so.

The Third Circuit next observed that the bankruptcy courts are courts of equity and require that petitioners seek relief in good faith. It explained: "As courts of equity, bankruptcy courts are equipped with the doctrine of good faith so that they can patrol the border between good- and bad-faith filings." *Id.* It found the good faith requirement applies in the involuntary context just as it does in the context of a voluntary filing. *Id.*

Finally, the Third Circuit found that requiring good faith of petitioning creditors is good policy. As courts uniformly recognize, an involuntary petition can have drastic consequences for the alleged debtor. As was well-stated in the widely cited *In re SBA Factors of Miami, Inc.*,

> An allegation of bankruptcy is a charge that ought not to be made lightly. It usually chills the alleged debtor's credit and his sources of supply. It can scare away his customers. It leaves a permanent scar, even if promptly dismissed. It is also obvious that the use of the bankruptcy court as a routine collection device would quickly paralyze this court.

13 B.R. 99, 101 (Bankr. S.D. Fla. 1981). Accordingly, creditors should be discouraged against placing a person into bankruptcy for the wrong reasons. 804 F.3d at 335. Imposing a bar to filing based on bad faith accomplishes that and ensures that those who proceed against better judgment will not benefit from it.

### 2. The Concept of "Bad Faith" Is Broadly Interpreted

What constitutes bad faith in the context of an involuntary petition is defined in the case law interpreting section 303(i)(2). Courts within the Ninth Circuit employ the "objective test" for bad faith. *See In re Wavelength, Inc.*, 61 B.R. 614, 619-20 (B.A.P. 9th Cir. 1986). That standard asks

1  "what a reasonable person would believe" at the time they filed the petition.  *Id.* (quoting *In re*
2  *Grecian Heights Owners' Ass'n*, 27 B.R. 172, 173 (Bankr. D. Or. 1982)).  Objective bad faith can be
3  found on a number of grounds.  For example, it is bad faith for a creditor to file an involuntary
4  petition out of ill will, malice, or the desire to embarrass or harass the debtor.  *In re Johnston Hawks*
5  *Ltd.*, 72 B.R. 361 (Bankr. D. Haw. 1987), *aff'd* 885 F.2d 875 (9th Cir. 1989).  Using a bankruptcy
6  filing as a substitute for customary collection procedures is also bad faith.  *Id.*  So too is filing an
7  involuntary petition without adhering to the requirements of the Bankruptcy Code.  *Id.*; *see also In re*
8  *Ramsden*, 17 B.R. 59, 60 (Bankr. D. Ga. 1981) (involuntary petition filed "without legal
9  justification" was filed in bad faith); *In re Godroy*, 37 B.R. 496, 500 (Bankr. D. Mass. 1984) (bad
10  faith found where single petitioning creditor failed to ascertain number of other creditors as relevant
11  to qualification of single creditor to commence involuntary case).  The *Johnston Hawks* court rested
12  its bad faith conclusion on the petitioning creditors' failure to "follow the provisions of the
13  Bankruptcy Code."  *Id.* at 367.  Among other things, the court found that "had the petitioning
14  creditors reviewed the underlying claim of [one of the petitioning creditors] with care, they may
15  have seen that [its] claim was subject to a bona fide dispute.  It was this disputed claim that le[]d to
16  the dismissal of the Involuntary Petition."  *Id.*

17  **3.  The Involuntary Petition Was Filed in Bad Faith**

18  Had the Petitioning Creditors reviewed Multibank's claim with care, they would have seen
19  that it is subject to a bona fide dispute as a matter of law.  The Multibank Forbearance Letter
20  Agreement asserted as the basis for Multibank's claim plainly recites that the underlying obligation
21  which Mr. Ritter guaranteed is secured by real property.  Nevada law is unambiguous that no
22  judgment shall enter against a guarantor of obligations secured by real property in excess of any
23  deficiency claim.  NRS § 40.495(4).  Yet Multibank's asserted claim amount in the Involuntary
24  Petition provides no credit whatsoever for the value of the Multibank Collateral in direct
25  contravention of that law.  In short, Multibank's claim *cannot* be accurately stated and is manifestly
26  subject to a bona fide dispute.  The Petitioning Creditors' reliance on Multibank's claim is all the
27  more inexcusable in light of *Turner*—appellate authority addressing a highly analogous fact pattern
28

1 and easily concluding that a bank with a claim like Multibank's cannot serve as a petitioning
2 creditor.

3 The Petitioning Creditors' willingness to proceed despite lacking the requisite claims to do
4 so—i.e., failing to properly follow the provisions of the Bankruptcy Code—strongly indicates that
5 they were driven by an improper motive. *See Johnston Hawks*, 72 B.R. at 367 (finding that while
6 failure to "follow provisions of the Bankruptcy Code . . . could be interpreted as constituting ill will,
7 malice, harassment, or acting on poor legal advice as bad faith, they could also be interpreted as
8 actions on the part of the petitioning creditors to use the bankruptcy court as a collection device,"
9 which is also bad faith).

10 The timing of the filing supports the conclusion that the Petitioning Creditors acted with
11 improper motive. On February 8, 2016, counsel to Mr. Ritter furnished counsel to PWB with a
12 settlement agreement containing terms which may be read to provide that $18.5 million in
13 extinguished claims against Mr. Ritter will be revived if, prior to May 16, 2017, he becomes the
14 subject of an involuntary petition which is not dismissed within ninety days.

15 Just three weeks later, PWB, together with Multibank and SV Litigation, filed their deficient
16 Involuntary Petition. Certainly the prospect of incurring $18.5 million in liability could be viewed
17 as valuable leverage over Mr. Ritter in the efforts of PWB and SV Litigation to collect on their
18 judgments against him. Using the Bankruptcy Code for such a purpose is also certainly bad faith.
19 *Johnston Hawks*, 72 B.R. at 367.

20 For all of the foregoing reasons, and as Mr. Ritter will further show at trial, the Involuntary
21 Petition should be dismissed.

## RESERVATION OF RIGHTS

Section 303(i) of the Bankruptcy Code provides as follows:

> If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment—
> 
>     (1)    against the petitioners and in favor of the debtor for—
> 
>         (A)    costs; or
> 
>         (B)    a reasonable attorney's fee; or
> 
>     (2)    against any petitioner that filed the petition in bad faith, for—
> 
>         (A)    any damages proximately caused by such filing; or

     (B)  punitive damages.

1 U.S.C. § 303(i).

  Mr. Ritter hereby reserves his right to judgment under subsection 303(i) of the Bankruptcy Code based upon the facts and circumstances set forth in this motion and upon such further relevant facts and circumstances as may be ascertained through discovery.

## CONCLUSION

  For all of the foregoing reasons, Mr. Ritter respectfully requests that the Court (a) dismiss the Involuntary Petition; and (b) grant such other and further relief as the Court deems just and proper.

Dated: March 21, 2016  
   Las Vegas, Nevada

**SCHWARTZ FLANSBURG PLLC**

By:  /s/ Samuel A. Schwartz  
  Samuel A. Schwartz  
  Nevada Bar No. 10985  
  sam@nvfirm.com  
Bryan A. Lindsey  
Nevada Bar No. 10662  
bryan@nvfirm.com  
6623 Las Vegas Boulevard South, Suite 300  
Las Vegas, NV 89119  
Telephone: (702) 385-5544  
Facsimile: (702) 385-2741

—and—

**WHITE & CASE LLP**  
Roberto J. Kampfner  
California Bar No. 179026  
rkampfner@whitecase.com  
555 South Flower Street, Suite 2700  
Los Angeles, CA 90071  
Telephone: (213) 620-7700  
Facsimile: (213) 452-2329

*Attorneys for the Alleged Debtor*