1   Richard F. Holley, Esq. (NV Bar No. 3077)
    Email: rholley@nevadafirm.com
2   Ogonna M. Brown, Esq. (NV Bar No. 7589)            E-filed on: July 11, 2018
    Email: obrown@nevadafirm.com
3   HOLLEY DRIGGS WALCH
    FINE WRAY PUZEY & THOMPSON
4   400 South Fourth Street, Third Floor
    Las Vegas, Nevada 89101
5   Telephone:    702/791-0308
    Facsimile:    702/791-1912
6   *Attorneys for VTS Investments, LLC*

7

8                   **UNITED STATES BANKRUPTCY COURT**

9                         **DISTRICT OF NEVADA**

10  In re:                                      Case No. BK-S-16-10933-BTB
                                                Jointly Administered
11  JOHN A. RITTER,                             Chapter 11
    ☒ Affects this Debtor.
12
    ───────────────────────────────            Case No. BK-S-16-13338-BTB
13  In re:                                      Chapter 11
    AGAVE PROPERTIES, LLC,
14  ☐ Affects this Debtor.
    ───────────────────────────────            Case No. BK-S-16-13340-BTB
15  In re:                                      Chapter 11
    CLIFFROSE INVESTMENTS, LLC,
16  ☐ Affects this Debtor.
    ───────────────────────────────            Case No. BK-S-16-13341-BTB
17  In re:                                      Chapter 11
    FOCUS SOUTH GROUP, LLC,
18  ☐ Affects this Debtor.
    ───────────────────────────────            Case No. BK-S-16-13342-BTB
19  In re:                                      Chapter 11
    FSG-S, LLC,
20  ☐ Affects this Debtor.
    ───────────────────────────────            Case No. BK-S-16-13343-BTB
21  In re:                                      Chapter 11
    JV PROPERTIES, LLC,
22  ☐ Affects this Debtor.
    ───────────────────────────────            Case No. BK-S-16-13344-BTB
23  In re:                                      Chapter 11
    N.G.A. #2, LLC,
24  ☐ Affects this Debtor.
    ───────────────────────────────            Case No. BK-S-16-13345-BTB
25  In re:                                      Chapter 11
    NORTHWEST INVESTMENTS, LLC,
26  ☐ Affects this Debtor.
    ───────────────────────────────            Case No. BK-S-16-13346-BTB
27  In re:                                      Chapter 11
    PV LAND INVESTMENTS, LLC,
28  ☐ Affects this Debtor.
    ───────────────────────────────



| | |
|---|---|
| In re:<br>SAGUARO EQUITIES, LLC,<br>☐ Affects this Debtor. | Case No. BK-S-16-13347-BTB<br>Chapter 11 |
| In re:<br>SOUTHWEST DESERT EQUITIES, LLC,<br>☐ Affects this Debtor. | Case No. BK-S-16-13348-BTB<br>Chapter 11 |
| In re:<br>SUCCOTASH, LLC,<br>☐ Affects this Debtor. | Case No. BK-S-16-13349-BTB<br>Chapter 11 |
| In re:<br>VICTOR INVESTMENTS, LLC<br>☐ Affects this Debtor. | Case No. BK-S-16-13350-BTB<br>Chapter 11 |
| VTS INVESTMENTS LLP, a Nevada limited liability partnership,<br><br>Plaintiff,<br><br>v.<br><br>JOHN A. RITTER, individually and as Trustee of MUSTANG TRUST,<br><br>Defendant. | Adv. 16-01114-BTB<br><br>**SECOND AMENDED COMPLAINT TO DETERMINE DISCHARGEABILITY PURSUANT TO 11 U.S.C. §§ 523(a)(2)(A), (a)(4), AND (a)(6)**<br><br>Judge: Hon. Bruce T. Beesley |

COME NOW Plaintiff VTS INVESTMENTS LLP ("VTS"), a Nevada limited liability partnership ("Plaintiff"), complains and alleges as follows:

## JURISDICTION AND VENUE

1.    This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) and is brought pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4), (a)(6) & (c)(1) and Rule 4007 of the Federal Rules of Bankruptcy Procedure ("Fed. R. Bankr. P.").

2.    This Court has jurisdiction as to the claims for relief sought herein under 28 U.S.C. §§ 157 and 1334.

3.    Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4.    Pursuant to LR 9014.2, Plaintiff consents to the entry of final orders and judgments by the bankruptcy judge if it is determined that the bankruptcy judge, absent the consent of the parties, cannot enter final orders or judgments in this matter consistent with Article III of the United States Constitution.

- 2 -

12388-01/1955709_3.docx

HOLLEY·DRIGGS·WALCH
FINE·WRAY·PUZEY·THOMPSON

5. On February 29, 2016, an involuntary petition was filed by Multibank 2009-1 RES-ADC Venture, LLC, Pacific Western bank and SV Litigation SPE, LLC as against Defendant JOHN A. RITTER ("Ritter").

6. On June 16, 2016, the Ritter bankruptcy case was converted to a Chapter 11 proceeding, by Motion and order to convert filed by Ritter. Order for relief was entered on June 17, 2016.

7. On June 17, 2016, all the other above-captioned debtors filed voluntary Chapter 11 bankruptcy petitions.

8. The United States Trustee for Region 17, which covers the District of Nevada, appointed an Official Committee of Unsecured Creditors (the "Committee") on June 28, 2016 [D.I. 141 and D.I. 142]. The Committee originally consisted of Michael Strickland from Multibank 2009-1 RES-ADC Venture, LLC, William M. Conges of Branch Banking & Trust Co., Bradley Boyd of Boyd Family Partnership LP, Jacques Massa of SV Litigation SPE LLC and Patrick Dermody of the Dermody Family Trust. On August 1, 2016, the Committee was expanded to include Todd Slusher of the Slusher Family Trust and Walter Schuppe of Pacific Western Bank [D.I. 215].

## PARTIES TO THE ACTION

9. VTS is, and at all times mentioned herein, was, a Nevada limited liability partnership, with its principal place of business in the County of Clark, State of Nevada.

10. The managing partner of VTS is VTS ASSET PROTECTION TRUST DATED 02-13-03 (the "Schettler Trust"), a trust organized and settled under the laws of the State of Nevada, with its principal place of business in the County of Clark, State of Nevada.

11. The investment trustee of the Schettler Trust is VINCE T. SCHETTLER, an individual ("Vince," and, together with VTS and the Schettler Trust, "Schettler").

12. Vince is, and at all times mentioned herein, was, a resident of the County of Clark, State of Nevada.

12388-01/1955709_3.docx

13.     Upon information and belief, Ritter and/or the Mustang Trust JOHN A. RITTER ("Ritter") is, and at all times mentioned herein, was, a resident of the County of Clark, State of Nevada.

14.     Upon information and belief, MUSTANG TRUST (the "Mustang Trust") is, and at all times mentioned herein, was, a trust organized and settled under the laws of the State of Nevada, with its principal place of business in the County of Clark, State of Nevada.

15.     Upon information and belief, Ritter is both the grantor and the trustee of the Mustang Trust.

16.     FOCUS INVESTMENT GROUP, LLC ("Focus") is, and at all times mentioned herein, was, a limited liability company organized under the laws of the state of Nevada, with its principal place of business in the County of Clark, State of Nevada.

17.     Upon information and belief, Ritter and/or the Mustang Trust, by or through JR Consolidated Holdings LLC, owns and controls 54.396500% of the issued and outstanding ownership interests in Focus[1]; Gemini 5, LLC owns and controls 18.496700% of the issued and outstanding ownership interests in Focus; VTS owns and controls 12.303900% of the issued and outstanding ownership interests in Focus[2]; the Andrew M. Flaherty Living Trust owns and controls 7.971500% of the issued and outstanding ownership interests in Focus; Notre Dame Development, Inc. owns and controls 2.763200 % of the issued and outstanding ownership interests in Focus; the Bross Family Trust owns and controls 1.64600% of the issued and outstanding ownership interests in Focus; the DeVore Family Trust owns and controls 1.013100% of the issued and outstanding ownership interests in Focus; the Champlin Family Trust owns and controls 0.553100% of the issued and outstanding ownership interests in Focus; Renae C. Griffin owns and controls 0.324700% of the issued and outstanding ownership interests in Focus; Geek Investments, LLC owns and controls 0.27300% of the issued and outstanding ownership interests in Focus; the Badger Family Trust owns and controls 0.084200% of the

---

[1] According to Ritter's filing in the jointly administered cases, Ritter and/or Mustang Trust owns 53% of Focus.

[2] VTS has filed a Proof of Claim in the Ritter Bankruptcy alleging ownership of 12.3039% of the issued and outstanding ownership interests in Focus.

12388-01/1955709_3.docx

issued and outstanding ownership interests in Focus; Nycole Cummings owns and controls 0.024100% of the issued and outstanding ownership interests in Focus; the Bing Bing Trust owns and controls 0.060100% of the issued and outstanding ownership interests in Focus; I. Scott Bogatz owns and controls 0.066100% of the issued and outstanding ownership interests in Focus; and Amanda Dalton owns and controls 0.023700% of the issued and outstanding ownership interests in Focus; Victor Holdings Manager Inc. owns and controls 0.0001% of the issued and outstanding ownership interests in Focus; and Flickering Star Trust 0.060100% of the issued and outstanding interest in Focus[3]

18.    According to Ritter, Ritter and/or Mustang Trust owns 53% of Focus.  [D.I. 181 and 213].  Plaintiff is informed and believes that in or about 2012, the Mustang Trust transferred its membership interests in Focus to JR Consolidated Holdings, LLC, a Nevada limited liability company ("JR Consolidate Holdings").  Plaintiff is further informed and believes that Ritter/Mustang Trust owns and controls JR Consolidated Holdings.

## **FACTUAL ALLEGATIONS RELEVANT TO ALL CAUSES OF ACTION**

19.    Plaintiff has filed an action in the District Court for Clark County, Nevada, Case No. A674306 (the "State Court Litigation") against various parties including the Ritter and/or the Mustang Trust.  The Plaintiff has been granted stay relief to pursue the State Court Litigation against any and all non-debtor Ritter and/or the Mustang Trust named in that action.

20.    The non-debtor entities named in the State Court Litigation are the following entities and additional background information related to these entities is as follows:

    (a)    Upon information and belief, FOCUS SOUTH GROUP, LLC ("Focus South Group") is, and at all times mentioned herein, was, a limited liability company organized under the laws of the state of Nevada, with its principal place of business in the County of Clark, State of Nevada.

    (b)    Upon information and belief, Ritter and/or the Mustang Trust FSG-S, LLC ("FSG-S") is, and at all times mentioned herein, was, a limited liability company

---

[3] These percentages of ownership are alleged upon information and belief as stated in the 2012 tax return of Focus Investment Group, LLC and may vary as discovery proceeds in this adversary.

organized under the laws of the state of Delaware, with its principal place of business in the County of Clark, State of Nevada.

(c)     Upon information and belief, FOCUS CONTRIBUTION, LLC ("Focus Contribution") is, and at all times mentioned herein, was, a limited liability company organized under the laws of the state of Nevada, with its principal place of business in the County of Clark, State of Nevada.

(d)     Upon information and belief, Ritter and/or the Mustang Trust RHM, LLC ("RHM") is, and at all times mentioned herein, was, a Nevada limited liability company, with its principal place of business in the County of Clark, State of Nevada.

(e)     Upon information and belief, RHM is, and at all times mentioned herein, was, the manager of Focus.

(f)     Upon information and belief and at all times mentioned herein, 99% of the interest in RHM was held by J.R. Consolidated Holdings, LLC ("JRCH"), a limited liability holding company organized under the laws of an unknown state, with its principal place of business in the County of Clark, State of Nevada.

(g)     Upon information and belief and at all times mentioned herein, 99.9% of the interest in JRCH is held by Ritter and/or the Mustang Trust.

(h)     Upon information and belief, THOMAS DEVORE ("Devore") is, and at all times mentioned herein, was, a resident of the County of Clark, State of Nevada.

(i)     Upon information and belief, Ritter and Devore are, and at all times mentioned herein, were, the managers of RHM.

(j)     Upon information and belief, HOLDINGS MANAGER, LLC ("Holdings Manager") is, and at all times mentioned herein, was, a limited liability company organized under the laws of the State of Nevada, with its principal place of business in the County of Clark, State of Nevada.

(k)     Upon information and belief, FIG MANAGEMENT SERVICES, LLC ("FIG Management Services") is, and at all times mentioned herein, was, a limited

HOLLEY·DRIGGS·WALCH
FINE·WRAY·PUZEY·THOMPSON

HDW

liability company organized under the laws of an unknown state, with its principal place of business in the County of Clark, State of Nevada.

(l)     Upon information and belief, FOCUS MANAGEMENT SERVICES, LLC ("Focus Management Services") is, and at all times mentioned herein, was, a limited liability company organized under the laws of the State of Nevada, with its principal place of business in the County of Clark, State of Nevada.

(m)     Upon information and belief, LANDTEK, LLC ("Landtek") is, and at all times mentioned herein, was, a limited liability company organized under the laws of the State of Nevada, with its principal place of business in the County of Clark, State of Nevada.

(n)     Upon information and belief, FSG-C, LLC ("FSG-C") is, and at all times mentioned herein, was, a limited liability company organized under the laws of the State of Nevada, with its principal place of business in the County of Clark, State of Nevada.

(o)     Upon information and belief, FSG-R, LLC ("FSG-R") is, and at all times mentioned herein, was, a limited liability company organized under the laws of the state of Nevada, with its principal place of business in the County of Clark, State of Nevada.

(p)     Upon information and belief, FSG-4, LLC ("FSG-4") is, and at all times mentioned herein, was, a limited liability company organized under the laws of the state of Delaware, with its principal place of business in the County of Clark, State of Nevada.

(q)     Upon information and belief, FSG-26A, LLC ("FSG-26A") is, and at all times mentioned herein, was, a limited liability company organized under the laws of the state of Nevada, with its principal place of business in the County of Clark, State of Nevada.

12388-01/1955709_3.docx

(r)    FSG-28, LLC ("FSG-28") is, and at all times mentioned herein, was, a limited liability company organized under the laws of an unknown state, with its principal place of business in the County of Clark, State of Nevada.

(s)    Upon information and belief, FSG-27B, LLC ("FSG-27B") and, collectively with FSG-C, FSG-R, FSG-4, FSG-26A, FSG-28, and FSG-S, the "Focus South Group Subsidiaries") is, and at all times mentioned herein, was, a limited liability company organized under the laws of the state of Nevada, with its principal place of business in the County of Clark, State of Nevada.

**FOCUS ROLL-UP**

21.    Schettler and Ritter developed a relationship over twelve (12) years leading up to the roll-up of Focus, during their partnerships in various real estate transactions with Schettler involving the acquisition of property and investments, the sale of various properties, and further investments through limited liability companies, which ownership was evidenced by membership interests in at least thirteen (13) different limited liability companies for business ventures in which Ritter was involved with Schettler.

22.    Specifically, from 1998 through 2006, Schettler acquired property and made investments in real property through the acquisition and ownership of, and membership in, many different limited liability companies, including, but not limited to, Agave Properties, LLC; Cliff Rose Investments, LLC; Focus Kyle Group, LLC; Focus South Group, LLC; JV Properties LLC ("JV Properties"); Northwest Investments, LLC; PV Land Investments, LLC; Saguaro Equities, LLC; Section 19 Investments, LLC; Succotash, LLC; Victor Investments, LP; West Henderson Investments, LLC; and Foco 2, LLC (collectively, the "Exchanged Entities").

23.    Ritter and/or the Mustang Trust was also a manager and member in many, if not all, of the Exchanged Entities.

24.    In the years before the organization of Focus and the exchange of the Exchanged Entities, the Exchanged Entities would make tax distributions as needed to protect their members from unfunded tax liabilities, and the same was discussed prior to the organization of Focus and the exchange of the Exchanged Entities.

- 8 -

25.    The policy of making tax distributions protected Schettler, Ritter and/or the Mustang Trust, and the other members of the Exchanged Entities from potential unfunded tax liabilities due to the capital gains and profit derived from the sale of properties, particularly when funds were re-invested for the benefit of the members of the Exchanged Entities.

26.    Plaintiff and Ritter, among others, participated in the roll up of these 19 LLCs into Focus in January 2007 based upon Ritter's misrepresentations to Plaintiff.

27.    Focus's structure created a tax liability issue, because when a property within one of the 19 rolled up LLCs was sold, Focus would receive all of the proceeds while the LLC originally on the property's title and its members would be responsible for 100% of the taxes.

28.    The roll up into Focus diluted the 19 LLC's ownership but did not dilute the tax consequences of the various LLCs or their members.

29.    Ritter made misrepresentations to VTS that upon roll-up of the Exchange Entities, Focus would continue to pay estimated tax obligations of the members in the Exchange Entities arising out of property sales.  In fact, the Focus Operating Agreement required Ritter to make tax distributions to ensure Focus's members were not burdened with taxes that should be paid by Focus – the entity receiving the money.

30.    This representation by Ritter was an absolute requirement of VTS rolling its separate investments into Focus.

31.    The tax issue did not impact Defendants in the same way, because Defendants' ownership in the 19 LLC that were rolled up into Focus was nearly identical to their post roll-up interest.

32.    On or about January 1, 2007, VTS, Ritter and/or the Mustang Trust, and the other members of the Exchanged Entities organized Focus as a Nevada limited liability company.

33.    According to the Master Exchange Agreement ultimately entered into by and among VTS, Ritter and/or the Mustang Trust, and the other members of the Exchanged Entities, Focus was organized to "acquire and hold all of the existing equity interests in the Exchanged Entities in an effort to achieve better access to financing, improved operational efficiencies,

- 9 -

provide a vehicle to make investments, acquisitions, to engage in other transactions and business, and to achieve other benefits."

34.    On or about January 1, 2007, Schettler, Ritter and/or the Mustang Trust, and the other members of the Exchanged Entities entered into the Master Exchange Agreement, pursuant to which the members contributed all of their existing equity interests in the Exchanged Entities to Focus in exchange for a total of 1,000,000 Units of Focus allocated among the members based on the existing real property appraisals and liabilities of the Exchanged Entities and other factors agreed to by the members.

35.    Upon information and belief, VTS and the other members of the Exchanged Entities contributed funds and other property to Focus Contribution as a pass through to Focus.

36.    Upon execution of the Master Exchange Agreement, Ritter and/or the Mustang Trust owned and controlled approximately 517,305 units in Focus, or approximately 51.7305% of the issued and outstanding ownership interests.  Plaintiff is informed and believes that the Mustang Trust later transferred its ownership interest in Focus to JR Consolidated Holdings. Plaintiff is further informed and believes that JR Consolidated Holdings is owned and/or controlled by Ritter/Mustang Trust. Plaintiff is further informed and believes that in or about 2012, the following entities also made assignments to JR Consolidated Holdings:  JV Properties, LLC, Agave Properties, Focus South Group, Northwest Investments, PV Land Investments, Saguaro Equities, LLC, Southwest Desert Equities, Victor Investments, and Focus Contribution, LLC.

37.    Upon execution of the Master Exchange Agreement and according to the Focus Investment Group, LLC's K-1 statement, VTS owned and controlled approximately 111,368 units in Focus, or approximately 12.303900% of the issued and outstanding ownership interests.

38.    In a document dated January 1, 2007, VTS, Ritter and/or the Mustang Trust, and the other members of Focus (collectively, the "Members") executed the Operating Agreement of Focus Investment Group, LLC (the "Operating Agreement") in order to "set out the agreement of the Members as to the conduct of investment activities and the affairs of [Focus] . . . ."

- 10 -

39.    The Operating Agreement incorporated the existing policy of the members of the Exchanged Entities to set aside funds to make tax distributions to the members upon the sale of properties.

40.    Specifically, Section 5.10(c)(iii) of the Operating Agreement required Focus to:

> make distributions ("Estimated Tax Distributions") to the Members until each Member has been distributed cash equal to such member's tax liability (calculated at the Assumed Tax Rate) estimated to be imposed on the Profit estimated by the Manager to be allocated to such Member under Section 5.5 hereof for any period (reduced by any Losses previously allocated to such Member under Section 5.5 that have not previously been taken into account under this Section 5.10(c) (the "Estimated Tax Liability").

41.    On or about January 1, 2008, the Focus Operating Agreement was amended.  The Operating Agreement was amended without the knowledge or consent of VTS. The Amended Operating Agreement was amended to expressly provide that Defendants owed a fiduciary obligation to Plaintiff under the Focus Operating Agreement, which expressly provides that members of Focus owe each other a fiduciary duty Section 7.11 of the Amended Operating Agreement of Focus as follows:

> **Section 7.11**    OTHER MEMBER OBLIGATIONS AND RIGHTS.
>
> Notwithstanding anything to the contrary in this Agreement, with respect to the activities of the Company, each Member shall owe a continuing fiduciary duty to the Company and each other Member.

**JV PROPERTIES DEAL RESULTED IN $3.7 MILLION TAX HIT**

42.    One of the primary transactions that caused the most damage to VTS involved JV Properties.  JV Properties was one of the 19 LLC's rolled into FIG.

43.    JV Properties was owned 55% by Mustang Trust (Ritter) and 45% by VTS.

44.    JV Properties contributed several properties to Focus, including 50 acres of land that was in escrow to sell for $57 million **prior** to the roll-up into Focus.  There was a special allocation as to Pod 111 (50 acres) on a 50/50 basis.

45.    Post roll-up, VTS held approximately 12% in Focus.

46.    Just three weeks into Focus's creation, the property sold, but Ritter refused to provide VTS with the required tax offsets.



HOLLEY·DRIGGS·WALCH
FINE·WRAY·PUZEY·THOMPSON

- 11 -

47.  As a result of the sale, which closed within weeks of the roll-up, there were capital gains taxes for which JV Properties' original members were responsible.

48.  However, all of the sale proceeds from the JV Properties sale went to Focus.

49.  In total, VTS's tax exposure on the JV Properties sale was $24,809,058, or 49.5% of Focus's gain.  At a 15% tax rate, VTS was responsible for approximately $3,721,359 in taxes.

50.  Pursuant to the Operating Agreement and Ritter's assurances to VTS, Focus should have made tax distributions to VTS to ensure VTS was not burdened with a tax liability arising from the sale.

51.  After Focus' creation, and despite funds being available, Defendants refused to make adequate tax distributions to VTS to protect it from unfunded tax liabilities due to the capital gains and profit from the sale of the properties, including JV Properties, that VTS contributed to Focus.

52.  VTS would never have permitted the transfer of JV Properties assets into Focus had it known that Ritter would not provide for payment of tax obligations arising out of a pending sale.

53.  But for the representations of Ritter, VTS would never have rolled up JV Properties into Focus.

54.  The subject of the tax liability arising from the sale of the JV Properties real property post-roll-up was the subject of considerable discussion between Schettler and Ritter.

55.  Ritter clearly understood the tax ramifications to VTS post roll-up and repeatedly promised VTS both before and after the roll-up that Focus would pay the estimated tax liability.

56.  The fact that Ritter never directed Focus to make the estimated tax payment to VTS is evidence of Ritter's intent to deceive.

57.  After the creation of Focus, Ritter and/or the Mustang Trust refused to cause Focus to make adequate tax distributions to VTS to protect Schettler from unfunded tax liabilities due to the capital gains and profit from the sale of properties contributed to Focus through Schettler's ownership interests in the Exchanged Entities.

- 12 -

58.     This includes, for example, distributions to allow Schettler to pay its portion of tax liabilities for a sale of property, said liabilities totaling approximately $57,000,000 to VTS.

59.     Ritter and/or the Mustang Trust refused to cause Focus to make adequate tax distributions to VTS even though adequate funds were available to make such distributions.

60.     Ritter and/or the Mustang Trust refused to cause Focus to make loss allocations to other members and instead over-allocated losses to Ritter and/or Mustang Trust for their benefit.

61.     Upon information and belief, Ritter and/or the Mustang Trust also caused Focus to distribute approximately $5,000,000 into an offshore account owned by Ritter, Mustang Trust, or a related entity, while claiming there were not sufficient funds to make adequate tax distributions to VTS.

62.     Ritter and/or the Mustang Trust's refusal to cause Focus to make adequate tax distributions to VTS caused Schettler significant damages, including, without limitation, tax liability, interest, and penalties.

63.     During the time Ritter and/or the Mustang Trust refused to cause Focus to make adequate tax distributions to VTS, Vince repeatedly asked for access to discuss his potential tax liability with Focus's tax accountants.

64.     Ritter and/or the Mustang Trust refused to allow Vince to discuss VTS's potential tax liability with Focus's tax accountants.

65.     Ritter and/or the Mustang Trust, instead, represented to Schettler that future investment losses to be allocated to VTS would offset investment profits allocated to VTS, which would eliminate VTS's tax liability.

66.     According to Ritter and/or the Mustang Trust, this was possible due to the accounting structure of the Exchanged Entities and Focus.

67.     Following the organization of Focus, however, Ritter and/or the Mustang Trust caused the accounting structure of Focus to change.

68.     As a result of Ritter and/or the Mustang Trust's change to the accounting structure of Focus, VTS was never allocated sufficient losses to offset the profits allocated to VTS.

- 13 -

69.    Neither VTS nor Schettler was made aware of the change in the Focus accounting structure or the potential tax liability until days after filing Schettler's tax returns were due under an extension, and months after a payment should have been made to the Internal Revenue Service.

70.    Ritter and/or the Mustang Trust's changes to the accounting structure of Focus were made without consulting Schettler and without regard to the detrimental effect such changes would have on Schettler.

71.    Ritter and/or the Mustang Trust's changes to the accounting structure of Focus benefited the Mustang Trust and Ritter to the detriment of the other Members, particularly VTS.

72.    Ritter and/or the Mustang Trust's changes to the accounting structure of Focus caused Schettler significant damages, including, without limitation, tax liability, interest, and penalties.

73.    In response to repeated demands by Schettler, Ritter and/or the Mustang Trust assured Schettler that VTS's unfunded tax liabilities would be "made whole" when Focus raised sufficient capital.

74.    Despite such assurances, VTS has never been made whole.

**RITTER OWNED AND CONTROLLED EVERYTHING AND HAD KNOWLEDGE**

75.    Ritter had knowledge of and was aware of the falsity and deceptiveness causing damage to VTS, as Ritter owned and/or controlled RHM, the manager of Focus.

76.    Ritter, through his entities owned and controlled approximately 54.396500% of Focus.  In these dual roles, Focus could not undertake any action without the express knowledge and consent of Ritter.  Ritter was ultimately the person who decided whether to issue payments to cover estimated tax obligations.

77.    Ritter, through his entities, engaged in conduct that with the intent to defraud and harm Plaintiff.

78.    After Ritter refused to provide tax distributions to VTS, subsequently VTS discovered that Ritter changed Focus's tax structure to benefit Ritter.

79.     Starting in 2007, which coincidentally is the commencement date of Focus, Ritter arbitrarily changed the tax structure without notifying the Focus members.

80.     The changes Ritter made steered  disproportionate loss allocations to benefit himself and resulted in VTS not having adequate losses to cover gains arising out of property sales.

81.     As the majority member and manager of Focus, Defendants had control over everything.

82.     Defendants changed the accounting structure of Focus without consulting Schettler, and without regard to the detrimental impact on VTS to the tune of millions of dollars.

83.     Defendants perpetrated their malicious and willful scheme to default VTS by creating the roll-up structure into Focus and diluting VTS's ownership interests in various entities, while leaving Defendants' interests nearly identical.

84.     Defendants' willful and malicious conduct is evidenced by the timing of the roll-up as it relates to the JV Properties transaction, which was in escrow pre-roll-up and closed post-roll-up, to VTS's grave detriment.

85.     Defendants failed to protect VTS from the tax hit, and willfully and maliciously failed to reserve the requisite tax distribution, while Defendants remained unscathed by the tax implications of their conduct.

**FOCUS SOUTH GROUP SETTLEMENT PAYMENT DIVERTED FROM VTS**

86.     In or about October or November, 2011, Ritter, Focus South Group, Holdings Manager, FIG Management Services, Focus Management Services, Landtek, and the Focus South Group Subsidiaries entered into a settlement with numerous builders and other parties related to the Inspirada development, ongoing litigation, and South Edge, LLC's bankruptcy.

87.     The United States Bankruptcy Court, District of Nevada approved the settlement agreement, which required payment to the Focus South Group Subsidiaries of at least $35.4 Million (the "Focus South Group Settlement Payment").

88.     As a 95 percent owner of Focus South Group, Focus was entitled to a substantial portion of the Focus South Group Settlement Payment.

- 15 -

89.    As a 12% owner of Focus, VTS's share of the <u>Focus South Group Settlement Payment</u> was approximately $4,788,824.

90.    Under the terms and conditions of the Focus Operating Agreement, and as a result of Ritter and/or the Mustang Trust's repeated assurances VTS and other Members would be "made whole" when sufficient capital came into Focus, the Focus South Group Settlement Payment should have resulted in a substantial distribution to VTS.

91.    However, notwithstanding its shares in Focus, VTS received nothing from the Inspirada Settlement.

92.    Defendants refused to distribute VTS's share of the <u>Focus South Group Settlement Payment</u> and other required distributions to VTS.

93.    In direct contravention to Defendants' representations to VTS, Defendants refused to make a distribution to VTS from the Inspirada Settlement as required by the Focus Operating Agreement.

94.    Following the Focus South Group Settlement Payment, Schettler made repeated demands upon Ritter and/or the Mustang Trust to make a distribution to VTS as required under the Operating Agreement.

95.    Ritter and/or the Mustang Trust refused to cause Focus to make any distribution to VTS or other Members as a result of the Focus South Group Settlement Payment, even though adequate funds were available to make such a distribution.

**FOCUS FUNDS DIVERTED TO CORE**

96.    In or about October 2008, Ritter and/or the Mustang Trust organized an entity or a group of entities named Core ("<u>Core</u>") to make money during the down economy, look for new business, and set up new business entities to make profit.

97.    Core's business purpose was identical to Focus's business purpose.

98.    Core was primarily created with assets from Focus diverted to Core to shield Ritter and/or the Mustang Trust from Focus's creditors and usurp business opportunities from Focus members who were not also Core members.

- 16 -

99. In 2008, VTS is informed and believes that Ritter began siphoning money out of Focus to CORE.

100. VTS is informed and believes that Ritter began using Focus money to conduct non-arms' length transactions with CORE to benefit the Defendants.

101. Around this time, Ritter started to withhold corporate information from VTS.

102. Ritter and/or the Mustang Trust did not disclose to the Focus members who would or would not be members of Core, and what the respective ownership interests of the Core members would be.

103. Upon information and belief, Schettler was not made a member of Core.

104. Ritter and/or the Mustang Trust improperly transferred Focus's cash and other assets -- which should have been available to make required distributions to VTS and other Focus members -- to Core to fund Core's investments and other business activities.

105. VTS is informed and believes that Ritter and/or the Mustang Trust diverted Focus' cash and other assets to Core to allow Core, and Ritter and/or the Mustang Trust, to benefit from such investments and other business activities to the detriment of Focus, VTS and the other Members.

106. In addition to diverting Focus assets to Core, VTS is informed and believes that Ritter and/or the Mustang Trust diverted significant cash and other Focus assets into various entities, trusts, offshore trusts and accounts benefiting only Ritter and/or the Mustang Trust and not VTS, to the detriment of Schettler.

107. VTS is informed and believes that Ritter and/or the Mustang Trust's diversion of Focus's cash and other assets into offshore trusts and other accounts reduced the capital available to Focus to make required tax distributions and other distributions to VTS, all to Schettler's detriment.

108. Ritter and/or the Mustang Trust benefited from Ritter and/or the Mustang Trust's diversion of Focus assets to Core and to various entities, trusts, offshore trusts and accounts benefiting only Ritter and/or the Mustang Trust.

- 17 -

**VTS ENTITLED TO AN ACCOUNTING UNDER OPERATING AGREEMENT**

109.    The initial Focus Operating Agreement as well as the Amended Operating Agreement required certain information, books, and records to be made available and provided to the Members.  Specifically, Section 6.3 of the Focus Operating Agreement states: "The books, records and accounts shall at all times . . . be open to the inspection of the Members at their reasonable request for proper purposes relating solely to their ownership of Units and subject to such confidentiality and other procedures determined by the Manager."

110.    In addition, Section 6.4 of the Focus Operating Agreement states:

> As soon as is practicable in the particular case, the Manager shall, upon request, but no less than annually, cause the Accountant to deliver to each member:
>
> (a)    Such information concerning the Company as shall be necessary for the preparation by such Member of its income or other tax returns;
>
> (b)    The Company's federal, state and local income tax returns for that year;
>
> (c)    Such other information as may be determined by the Manager as reasonably necessary for the Members to be advised of the results of the operations of the Company.

111.    Schettler made repeated demands upon Ritter and/or the Mustang Trust to cause Focus to provide information, documents, and company records to VTS.

112.    To date, Defendants have refused to provide VTS with an accounting despite repeated demands and VTS's entitlement to an accounting pursuant to Section 6.4 of the Operating Agreement.

113.    Despite the requirements of the Focus Operating Agreement and the repeated demands by Schettler, Ritter and/or the Mustang Trust refused, and continue to refuse, to cause Focus to provide information, documents, and company records to VTS.

114.    Ritter and/or the Mustang Trust's refusal to cause Focus to provide information, documents, and company records to VTS caused Schettler significant damages, including, without limitation, tax liability, interest, and penalties.

12388-01/1955709_3.docx

115.     Beginning in 2010, Ritter and/or the Mustang Trust excluded Schettler from company meetings, including, without limitation, board meetings and cash flow meetings.

116.     Upon information and belief, Ritter and/or the Mustang Trust excluded Schettler from company meetings in order to prevent Schettler from discovering Ritter and/or the Mustang Trust's mismanagement and wrongful diversion of Focus' cash and other assets, failure to make adequate tax distributions to VTS as required by the Focus Operating Agreement, other breaches and defaults of the Focus Operating Agreement by Ritter and/or the Mustang Trust, and generally freeze Schettler out of his role in making decisions and having a role in the management of Focus.

117.     Ritter and/or the Mustang Trust also caused the Focus Operating Agreement to be amended on at least two occasions without even advising Schettler.

118.     Ritter and/or the Mustang Trust's actions had the effect of disappointing and frustrating VTS's reasonable expectations as a minority member of Focus.

### FIRST CAUSE OF ACTION

### (11 U.S.C. § 523(a)(2)(A))

119.     Plaintiff incorporates by reference all preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

120.     Ritter and/or the Mustang Trust made misrepresentations, fraudulent omissions and engaged in deceptive conduct to induce Plaintiff to participate in the roll-up for the benefit of Ritter and/or the Mustang Trust .

121.     Ritter had knowledge of and was aware of the falsity and deceptiveness causing damage to VTS.  Ritter owned and/or controlled RHM, the manager of Focus.  Moreover, Ritter, through his entities owned and controlled approximately 54.396500% of Focus.  In these dual roles, Focus could not undertake any action without the express knowledge and consent of Ritter.  Ritter was ultimately the person who decided whether to issue payments to cover estimated tax obligations and make other distributions.

122.     Defendants intended to deceive Plaintiff through their scheme of fraud and misrepresentations.

123.    Both before and after the roll-up, Ritter assured Schettler that VTS's unfunded tax liabilities would be paid by Focus.  .

124.    VTS justifiably relied upon Defendants' representations based on over twelve years of trusting Ritter and relying upon his representations in business dealings over the years.

125.    VTS's reliance Defendants' representations was further justified, because in previous years, loss allocations were based upon capital allocated in each entity and paid by the applicable LLC..

126.    Plaintiff was damaged due to Defendants' failure to honor pre-roll-up representations, comply with Section 5.10(c)(iii) of the Operating Agreement, which required Focus to make estimated tax distributions to Plaintiff, and post-roll-up representations.

127.    Plaintiff was damaged in the amount of approximately $3.7 million in tax liabilities Focus failed to make at Ritter's direction.

128.    Plaintiff was also damaged because under the settlement agreement, payment was to be made to the Focus South Group Subsidiaries in the amount of at least $35.4 Million, and because Focus was a 95 percent owner of Focus South Group, Plaintiff was entitled to a substantial portion of the Focus South Group Settlement Payment.

129.    Plaintiff suffered damages arising from Focus' failure to remit to Plaintiff its 12% of the $43 million settlement that came into Focus, or $4,785,900 due to VTS.

130.    Plaintiff was damaged because it was shorted on various tax-loss allocations and Focus money was improperly distributed to other entities to VTS's detriment in the amount of $12 million in damages to VTS.

131.    Plaintiff suffered damage proximately caused by its reliance on Defendants' statement and conduct in excess of $10,000.

132.    The damages incurred by Plaintiff  as a result of the conduct of Ritter and/or the Mustang Trust are non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

**SECOND CAUSE OF ACTION**

**(11 U.S.C. § 523(a)(4))**

133.    Plaintiff incorporates by reference all preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

134.    Ritter and/or the Mustang Trust's liability to Plaintiff alleged herein, is a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny" within the meaning of 11 U.S.C. § 523(a)(4).

135.    Defendants committed fraud and/or against Plaintiff by engaging in a scheme to induce Plaintiff to participate in a roll-up structure into Focus and diluting VTS's ownership interests in various entities, while leaving Defendants' interests nearly identical and then refusing to pay Plaintiff's tax liability.

136.    At all relevant times, Ritter was in a position of trust and owed a fiduciary duty to Plaintiff

137.    Defendants' fiduciary duty to Plaintiff arises in part under Nevada law, which imposes fiduciary duties on managers and members of an LLC to other members.

138.    Defendants' fiduciary duty to Plaintiff also arises in part under Section 7.11 of the Amended Operating Agreement of Focus, which expressly provides that members of Focus  owe each other a fiduciary duty.

139.    Defendants had a fiduciary obligation to Plaintiff to ensure that Plaintiff received its promised distribution to offset taxes from its gain, but refused to do so, diverted funds from the Inspirada settlement and impermissibly transferred Focus funds to CORE and to offshore accounts to the detriment of Plaintiff, among other things.

140.    Ritter and/or the Mustang Trust conduct was intentional, in bad faith and immoral and to the direct detriment of Plaintiff.

141.    Ritter and/or the Mustang Trust used and/or disbursed Focus assets without explanation, reason or purpose thereby depriving the Plaintiff of their right, use and enjoyment of said improperly transferred Focus assets.

12388-01/1955709_3.docx

142.    The Focus assets were entrusted to Ritter and/or the Mustang Trust and Ritter and/or the Mustang Trust misappropriated the Focus Assets for a use other than that for which it was entrusted and instead for Ritter and/or the Mustang Trust's benefit.

143.    Alternatively, Ritter and/or the Mustang Trust wrongfully came into possession of the Focus assets and Ritter and/or the Mustang Trust misappropriated the Focus Assets for Ritter and/or the Mustang Trust's benefit.

144.    Had the Ritter and/or the Mustang Trust not engaged in this misconduct, funds would be available to the Plaintiff.

145.    Plaintiff sustained damages as a result of the Ritter and/or the Mustang Trust's fraud and defalcation while acting in a fiduciary duty

146.    Plaintiff sustained damages as a result of the Ritter and/or the Mustang Trust's embezzlement and/or larceny of the Focus assets.

147.    Thus, Plaintiff is entitled to an Order from this Court declaring that, pursuant to 11 U.S.C. § 523(a)(4), the debt owed to Plaintiff is non-dischargeable.

### THIRD CAUSE OF ACTION

### (11 U.S.C. § 523(a)(6))

148.    Plaintiff incorporates by reference all preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

149.    As the majority member and manager of Focus, Defendants had control over everything.

150.    Defendants changed the accounting structure of Focus without consulting Schettler, and without regard to the detrimental impact on Plaintiff to the tune of millions of dollars.

151.    Defendants perpetrated their malicious and willful scheme to defraud VTS by creating the roll-up structure into Focus and diluting VTS's ownership interests in various entities, which leaving Defendants' interests nearly identical.

- 22 -

12388-01/1955709_3.docx

152.    Defendants' willful and malicious conduct is evidenced by the timing of the roll-up as it relates to the JV Properties transaction, which was in escrow pre-roll-up and closed post-roll-up, to Plaintiff's grave detriment.

153.    Among other things, Defendants failed to protect Plaintiff from the large tax liability, and willfully and maliciously failed to reserve the requisite tax distribution, while Defendants remained unscathed by the tax implications of their willful and malicious conduct.

154.    Among other things, Defendants willfully and maliciously failed to remit to Plaintiff any portion of the funds arising from the settlement agreement that paid the Focus South Group Subsidiaries at least $35.4 Million, as Focus was a 95 percent owner of Focus South Group entitled to a substantial portion of the Focus South Group Settlement Payment

155.    Among other things, Defendants willfully and maliciously diverted the funds from Plaintiff by transferring the settlement proceeds to Core to fund Core's investments and other business activities instead of remitting a portion of the funds to Plaintiff.

156.    Defendants' acts were intentional, based upon the timing of these events pre- and post-roll-up, the repeated misrepresentations made, Defendants' complete failure to protect Plaintiff from devastating tax liabilities in numerous transactions, and Defendants diversion of Plaintiffs' funds, including settlement funds, into Core and off shore accounts.

157.    Among other things, Defendants' willful and malicious misconduct in diverting funds to which Plaintiff was entitled was substantially certain to result in injury to Plaintiff through the loss of Plaintiff's money paid to invest in the real estate.

158.    Among other things, Defendants' willfully and maliciously refused to cause Focus to make adequate tax distributions to Plaintiff causing injury to Plaintiff.

159.    Among other things, Defendants' willful and malicious unauthorized diversion of funds to Core from the $35.4 million Focus South Group settlement caused injury of Plaintiff.

160.    Ritter and/or the Mustang Trust willfully and maliciously transferred Focus assets to the detriment of Plaintiff.



- 23 -

161.    These transfers were made without authorization or approval of the other members of Focus, including Plaintiff, and were done with the actual intent to deprive Plaintiff of the use of its assets and to avoid making distributions to Plaintiff.

162.    Ritter and/or the Mustang Trust's actions and inactions were willful, malicious and done with reckless disregard for the Plaintiff, and because of Ritter and/or the Mustang Trust's actions, Plaintiff suffered damages.

163.    Plaintiff sustained damages as a result of Ritter and/or the Mustang Trust's willful and malicious conduct which operated to injure Plaintiff.

164.    Defendants' acts cannot be justified or excused.

165.    Accordingly, Plaintiff is entitled to an Order from this Court declaring that, pursuant to 11 U.S.C. § 523(a)(6), the debt owed to Plaintiff is non-dischargeable.

## FOURTH CAUSE OF ACTION

### (Accounting)

166.    Plaintiff incorporates by reference all preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

167.    Under applicable law, ethical principles and the fiduciary relationship arising between Plaintiff and Defendants, Plaintiff is entitled to an accounting.

168.    Plaintiff is likewise entitled to an accounting under Section 6.4 of the Operating Agreement.

169.    Plaintiff has made repeated demands to Defendants for an accounting.

170.    Defendants have repeatedly refused to comply with Plaintiff's demands for an accounting.

171.    Plaintiff requires an accounting to have the ability to calculate the extent of the damages it has suffered at the hands of Defendants' fraud and wrongful conduct. Accordingly, Plaintiff is entitled to an Order from this Court for an accounting of the books and records of Focus and the Exchanged Entities in which Plaintiff holds an interest.

- 24 -

**PRAYER**

WHEREFORE, Plaintiff expressly reserves the right to amend this Complaint prior to or at the time of trial of this action, to insert those items of damage not yet fully ascertainable, any additional causes of action that are as yet unknown and may be discovered, and pray for judgment against Ritter and/or the Mustang Trust, and each of them, as follows:

1.    For general damages in an amount in excess of $10,000;

2.    For special damages in an amount in excess of $10,000;

3.    For punitive damages in an amount to be determined at trial;

6.    For reasonable attorneys' fees and costs of suit;

7.    For interest at the statutory rate; and

8.    For such other and further relief as the Court deems just and proper.

Dated this ___11th___ day of ___January___, 2018.

**HOLLEY DRIGGS WALCH**
**FINE WRAY PUZEY & THOMPSON**

Richard F. Holley, Esq. (NV Bar No. 3077)
Ogonna M. Brown, Esq. (NV Bar No. 7589)
400 South Fourth Street, Third Floor
Las Vegas, Nevada 89101
Telephone: 702/791-0308
Facsimile: 702/791-1912
*Attorneys for VTS Investments, LLC*

HOLLEY·DRIGGS·WALCH
FINE·WRAY·PUZEY·THOMPSON

12388-01/1955709_3.docx

**CERTIFICATE OF SERVICE**

I hereby certify that I am an employee of Holley Driggs Walch Fine Wray Puzey & Thompson, and that on the 11th day of January, ~~2017~~ 2018, I caused to be served a true and correct copy of SECOND AMENDED COMPLAINT in the following manner:

☒    (ELECTRONIC SERVICE)  Under Administrative Order 02-1 (Rev. 8-31-04) of the United States Bankruptcy Court for the District of Nevada, the above-referenced document was electronically filed on the date hereof and served through the Notice of Electronic Filing automatically generated by that Court's facilities.

☐    (UNITED STATES MAIL)  By depositing a copy of the above-referenced document for mailing in the United States Mail, first class postage prepaid, at Las Vegas, Nevada, to the parties listed on the attached service list, at their last known mailing addresses, on the date above written.

☐    (OVERNIGHT COURIER)  By depositing a true and correct copy of the above-referenced document for overnight delivery via Federal Express, at a collection facility maintained for such purpose, addressed to the parties on the attached service list, at their last known delivery address, on the date above written.

☐    (FACSIMILE)  That I served a true and correct copy of the above-referenced document via facsimile, to the facsimile numbers indicated, to those persons listed on the attached service list, on the date above written.

An employee of Holley Driggs Walch Fine Wray Puzey & Thompson

12388-01/1955709_3.docx